**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Mark BERKWITT and Barry Berkwitt, Defendants-Appellants.**

**Nos. 79–1125, 79–1138.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 22, 1979.

Decided April 21, 1980.

---

Robert A. Korenkiewicz, Chicago, Ill., for defendants-appellants.

Thomas P. Sullivan, U. S. Atty., Robert J. Hackman, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL, Circuit Judge, VAN DUSEN, Senior Circuit Judge,* and TONE, Circuit Judge.

PELL, Circuit Judge.

This is a consolidated appeal from appellants' convictions arising out of their manufacturing and vending eight-track recording tapes without authorization of the copyright owners. Appellants were found guilty by a jury of one count of illegal transportation of stolen property in violation of 18 U.S.C. § 2314, and twenty counts of willfully violating the copyright laws, 17 U.S.C. § 101 *et seq.* The facts are not in dispute and are as follows.

On the morning of February 18, 1977, FBI agents, while conducting a surveillance operation, observed appellants in front of their apartment in St. Charles, Illinois, loading a number of brown cardboard boxes into a Volkswagen van owned by the appellant Mark Berkwitt. The agents then followed the appellants as they drove the van from their apartment to a destination in Indiana. Once across the Indiana border, appellants stopped at a motor lodge in Hammond, Indiana, and met with Robert Horton, their prospective buyer of the tapes. While the appellants were in the lodge with Horton, one of the agents looked into the van and observed the cardboard boxes but he could not see their contents. Appellants later left the lodge and followed Horton in their van to his apartment at 907 Ames Street in Hammond, Indiana. At this apartment, the agents observed Horton and two unidentified individuals unload the cartons from the van and take them into the apartment building.

For the next few hours, the agents continued to watch the apartment and the appellants' empty van. At about 2:30, Horton left the apartment building with four cartons similar in appearance to those previously observed in the van. He put the cartons in his automobile trunk and drove away. He was followed to another residence he had in the Gary, Indiana, area where he was "confronted" by the agents. After about an hour of questioning, Horton consented to a search of his trunk where

the boxes were found to contain approximately 889 eight-track tapes lacking copyright notices. This information was transmitted at about 4:30 p. m. to the agents who had remained at or returned to the Ames Street apartment. At about 6:30 p. m., the agents at the apartment received instructions by radio that they were to do nothing unless the van was loaded and moved, in which case they were to stop and search the van and seize its contents. The agents at this time made inquiries about obtaining a warrant to search the apartment and were informed that it was being "researched."

At about 7:00 p. m., there was a flurry of activity at the apartment.[1] One of the appellants ran out of the apartment and drove off in the van and the two unidentified men similarly left, but in another vehicle. In accordance with their instructions, the agents did not follow the van at this time. About five minutes later, however, the van returned to the apartment and the appellants began reloading it with brown cardboard boxes similar in appearance to those seized from Horton. The appellants then got into the van and drove away.

The agents quickly stopped the van and as they approached it with guns drawn and pointed towards the ground, Barry Berkwitt exclaimed, "You got us." The agents then identified themselves, gave *Miranda* warnings, and conducted a patdown search for weapons. Appellants were advised at that time, however, that they were not under arrest. One agent peered into the van through the windows and noticed that one of the boxes had an open top and contained eight-track tapes. The agent then entered the van, searched it, and found approximately 1400 such tapes, none of which had copyright notices affixed to them. The boxes were then seized.

The agent in charge then advised the appellants they were not under arrest but he also told them to stay where they were until he returned to his vehicle to obtain instructions on how to proceed. Five or ten minutes later, the agents were directed not to arrest the appellants. The appellants were so informed and were told they were free to leave. The appellants, however, remained on the scene for about an hour to learn the disposition of their van and to see if they could get a ride back to Chicago with the agents.

A short while later, the agents searched the Ames Street apartment with the consent of the owner of the building. The owner kept clothes and other goods in the apartment and sometimes slept there, and the legality of this search is not challenged. In the apartment, the agents discovered about 50 or 60 brown cardboard boxes containing tapes, wrappings, tape racks and other such paraphernalia. Thirteen boxes were found containing approximately 2,314 eight-track tapes lacking copyright notices. The apartment also contained numerous pieces of equipment used in the manufacture and packaging of eight-track tapes including a winder, a shrink-wrap machine, and a stereo player.

The next morning, February 19th, pursuant to a search warrant, the issue of which was partially, at least, based on the information gained from the searches of the van and the Ames Street apartment, agents entered and searched appellants' apartment in St. Charles, Illinois. They discovered there a variety of equipment used in the manufacture of eight-track tapes including an Ampex master-maker, a Liberty duplicator with three slave duplicators, one winder, a degausser, a delineator, masters, pancakes, eight-track cartridge components, stereo components, phonographic records, a stopwatch, *Billboard* magazine and business records.

Based upon this evidence, appellants were indicted on October 19, 1978, for violations of the previously cited statutes. Appellant Barry Berkwitt was arraigned on November 17, 1978, and appellant Mark Berkwitt on December 19, 1978. After denials of

---

1. Horton testified that a friend called the Ames Street apartment about this time. It would seem fairly safe to assume that the appellants had become aware of Horton's brush with the law.

various pretrial motions of the appellants, including a motion for a continuance, appellants went to trial as scheduled on January 3, 1979. The jury returned a verdict of guilty on all counts,[2] and appellants were sentenced on January 31, 1979.

On Count One, Barry Berkwitt received a sentence of five years imprisonment, only six months of which was to be served in an institution, and Mark Berkwitt received a sentence of four years with only four months to be served on a work release program. The remainder of the sentences were suspended. On the remaining counts, the appellants were placed on one year's probation, all to run concurrently but as a whole to be consecutive to the Count One sentences.

## THE SPEEDY TRIAL ACT

Appellants initially complain that their prosecution should be barred for failure to comply with the provisions of the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* They maintain that the stop on February 18, 1977, was an arrest and that the delay in obtaining their indictments until October 19, 1978, violated the Act's provisions requiring an indictment within 60 days of the arrest. 18 U.S.C. § 3161(f). They request, therefore, this court to dismiss the prosecution as provided under § 3162(a).

This contention, of course, would fail if there were no arrest. The Government contends there was not and the district court agreed with this position in connection with the search and seizure aspect of the case. The Berkwitts, although contending for the present purposes that there was an arrest, somewhat inconsistently argue that the search could not be incident to an arrest, presumably being willing for the latter purpose to accept the Government's position.

■ In any event, even though the question might be a close one, notwithstanding that the Berkwitts were expressly told they were not under arrest, we do not need to decide the question for disposition of the present issue. We hold that the dismissal which the appellants seek was not an available remedy under the Speedy Trial Act. The sanction section of that Act, 18 U.S.C. § 3162, was originally made effective on July 1, 1979 (*see* 18 U.S.C. § 3163(c)), a date about six months after appellants' trial. This fact alone would put to rest any question about the availability to the appellants of the dismissal sanction. Our position is made even stronger by the fact that the Act was recently amended to make § 3162 effective and applicable only to cases commenced by arrest or summons on or after July 1, 1980. 18 U.S.C. § 3163(c) *as amended by* P.L. 96–43, 1979 U.S. Code Cong. & Admin. News, 93 Stat. 327, 328–29 (1979). In light of these circumstances, we deny appellants' request for dismissal based on the Speedy Trial Act.

## THE SEARCH AND SEIZURE

Appellants next argue that probable cause for a search arose at 10:00 a. m. on the morning of the 18th when the FBI agent observed the cartons in the van at the motor lodge, or, at the latest, at 4:30 p. m. when the boxes of illegal tapes were discovered in Horton's trunk. They complain that given the amount of elapsed time between the existence of probable cause and the search of the van, there was no legitimate excuse for the agents' failure to obtain a warrant allowing the search of the van. They conclude, therefore, that the evidence seized from the van and from the resulting tainted search of the St. Charles apartment should be suppressed. We disagree.

■ Initially it is to be noted that even if probable cause did exist at 10:00 a. m. or 4:30 p. m., there is no requirement that the Government obtain a warrant at the first moment probable cause exists. *Cardwell v. Lewis*, 417 U.S. 583, 595–96, 94 S.Ct. 2464, 2471–72, 41 L.Ed.2d 325 (1974); *United States v. Weinrich*, 586 F.2d 481, 493–94 (5th Cir. 1978), *cert. denied sub nom. Blair v. United States*, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed. 243, and *Weinrich v. United*

---

2. During the course of the trial, the Government voluntarily dismissed Count 18.

*States,* 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979); *United States v. Mitchell,* 538 F.2d 1230, 1233–34 (5th Cir. 1976), *cert. denied,* 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792 (1977). In any event, we are not persuaded that probable cause did attach at these times. At 10:00 a. m., it was not certain what the boxes in the van contained, and appellants fail to realize that at 4:30 p. m., the van was empty of all boxes and remained so until right before the search.

In our opinion, the warrantless search of the van was justified by the exigent circumstances present at the time of the search. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), *and compare Coolidge v. New Hampshire,* 403 U.S. 443, 458–64, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Subsequent to the Horton incident, followed by the reloading of the van, the agents at the time of the attempted departure did have probable cause to believe the van contained contraband. As the van most likely would have been moved prior to the obtaining of a search warrant, a warrantless search was necessary. Furthermore, we do not believe the exigency arose from the deliberate or unreasonable delay on the part of the agents. The record amply demonstrates the agents did not purposely wait for "exigent circumstances" to arise to avoid the necessity of obtaining a warrant. *See Mitchell, supra* at 1233–34, and *Weinrich, supra* at 493. The agents had requested a warrant prior to the stop of the van and were under the impression one was being obtained. *Compare Niro v. United States,* 388 F.2d 535, 539–40 (1st Cir. 1968). We conclude, therefore, that the district court correctly denied appellants' motions to suppress the evidence obtained from the van. As the appellants' arguments regarding the St. Charles apartment search are dependent upon the suppression of the evi-

dence obtained from the van, that contention similarly fails.

## EVIDENTIARY RULINGS

At trial, the Government introduced the testimony of three buyers of the appellants' tapes, assertedly to establish the knowledge of the appellants of the illegality of their acts. The district court allowed the introduction under Federal Rule of Evidence 404(b).[3]

One of the witnesses, Leonard Taub, testified that he purchased more than 500 tapes from Barry Berkwitt in the summer of 1975 and that at least a portion of these tapes were confiscated by the FBI in November of that year for violation of the copyright laws. Taub testified that he stopped dealing with Barry Berkwitt at that time. A second witness, Talman Thomas, testified that he purchased tapes from Barry Berkwitt in 1976 and that these tapes were similarly confiscated by the FBI during that year for copyright law violations. Thomas testified that he informed Barry Berkwitt of the seizure at that time. The last witness, William Haglund, testified to being a purchaser of approximately 4200 of the Berkwitt tapes during 1975 and 1976. He testified that Barry and Mark Berkwitt worked together in connection with Haglund's business, that business conversations were with Barry but that Mark actually delivered the tapes. It was Haglund, in fact, who sold the Volkswagen van to Mark in 1975. Appellants object to the admission of the above testimony as being irrelevant and concerning a period of time too remote from the time of their challenged conduct to have sufficient probative value to outweigh its prejudicial effect.

In *United States v. Feinberg,* 535 F.2d 1004, 1009 (7th Cir. 1976), *cert. denied,* 429 U.S. 929, 97 S.Ct. 337, 50 L.Ed.2d 300, this court restated the well established rule

---

**3.** Federal Rule of Evidence 404(b) provides in part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in

conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

that evidence of prior criminal acts is admissible on the issue of the defendant's knowledge or intent if (1) the prior act is similar enough and close enough in time to be relevant, (2) the evidence of the prior act is clear and convincing, (3) the probative value of the evidence outweighs the risk of prejudice, and (4) the issue to which the evidence is addressed is disputed by the defendant. We think the *Feinberg* test was met in the present case. *See United States v. Whetzel*, 589 F.2d 707, 712 (D.C. Cir. 1978).

As to the first element, the transactions described in the testimony of the witnesses were nearly identical to and occurred within the two year period immediately preceding the events charged in the indictment. In *United States v. Zeidman*, 540 F.2d 314, 319 (7th Cir. 1976), this court allowed the introduction of similar testimony concerning prior criminal acts which had occurred up to five years before the acts challenged in the indictment. Under these circumstances, we believe the evidence was clearly relevant. With regard to the second element, we note that the testimony was direct and was unimpeached. Such testimony is ordinarily held to satisfy the clear and convincing standard. *United States v. Dolliole*, 597 F.2d 102, 107 (7th Cir. 1979), *cert. denied*, 442 U.S. 946, 99 S.Ct. 2894, 61 L.Ed.2d 318. As to the third element, the district court explicitly made a finding that the probative value of the testimony outweighed the risk of prejudice, a procedure this court encouraged in *Dolliole, supra* at 106. In light of the rule that when applying the Rule 403[4] standard this court is obligated to afford substantial deference to the evidentiary ruling of the trial court, *Dolliole, supra* at 107, *United States v. Weidman*, 572 F.2d 1199, 1201–02 (7th Cir. 1978), *cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113, we cannot say that the trial judge abused his discretion in allowing the testimony. Lastly, with regard to the fourth element, we note that knowledge that the property was stolen is an essential element which the Government was required to prove as part of its *prima facie* case, *Whetzel, supra* at 712, *and see* 18 U.S.C. § 2314 *and* 17 U.S.C. § 101 *et seq.* The jury was so instructed, and Barry Berkwitt's attorney emphasized this demand to the jury in his opening statement. We find, therefore, that appellants' argument on this point is groundless.

Appellant Mark Berkwitt objects further that even if parts of the challenged testimony could be properly introduced to establish Barry Berkwitt's knowledge, the testimony, at best, simply places Mark with his brother on various prior occasions. He complains such evidence is not probative on the issue of his guilt except to establish guilt by association. We do not agree. Haglund was the only witness to refer to Mark beyond simple identification and his testimony that Mark delivered illegal tapes to him is probative to show Mark's involvement in the overall scheme as well as to allow a reasonable inference by the jury of Mark's knowledge and intent. In view of the evidence that Mark drove the van from St. Charles to Hammond, that Mark was present when Barry purchased various tape-manufacturing equipment and supplies, that the St. Charles apartment was leased to Mark, and that Mark operated the shrink-wrap machine with Horton and Barry on February 18th, we think this testimony placing Mark with Barry during prior illegal occurrences was clearly relevant, even though arguably insufficient on its own to incriminate Mark. Furthermore, in light of the evidence introduced at trial mentioned above and the cautionary instruction given to the jury by the trial judge on the limited probative value to be given Mark Berkwitt's presence at these prior occasions, Mark was not, in our opinion, seriously prejudiced by the introduction of the challenged testimony. In sum, we

4. Federal Rule of Evidence 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

find the trial judge's exercise of his discretion in allowing this testimony was proper.

## THE $5,000 MINIMUM LIMITATION

In the indictment, the appellants were charged with the illegal transportation of stolen property only on February 18, 1977. It did not allege an ongoing conspiracy to transport other than on that date. The appellants complain that the Government failed to present evidence sufficient to lead a reasonable jury to conclude that $5,000 worth of stolen property was transported across state lines on the 18th as charged and as required by 18 U.S.C. § 2314.[5] Basically, the appellants present two objections: first, that there was insufficient evidence to show exactly how many tapes were transported on the 18th; and second, that there was insufficient proof as to the value of each tape to support the conclusion that $5,000 worth of tapes was transported at that time.

*The Number of Tapes.*

Appellants do not contest the finding that the 889 tapes seized from Horton's trunk were transported on the 18th, nor does the Government pursue its claim made in its brief that the tapes seized from the Ames Street and St. Charles apartments should be treated as having been transported on that date.[6] Rather, the principal controversy is whether the 1400 tapes seized from the van were sufficiently proven to have been transported on the 18th so that they could be used to meet the $5,000 limitation. Appellants complain that because the boxes transported to Hammond on the 18th were commingled with boxes already

in the Ames Street apartment prior to any boxes being reloaded on the van, it would have been unreasonable for the jury to conclude that the tapes taken from the van were necessarily transported on the 18th.

■ We think there was evidence sufficient to lead a reasonable jury to conclude that the tapes seized from the van were shipped on the 18th when Horton testified that Government Exhibit "F," which were the tapes seized from the van, were the "newer tunes" that were to be transported, and in fact were transported on the 18th. Also, we think there was an inference that the tapes which were reloaded into the van were those which had been brought to Indiana earlier in the day. The tapes which Horton had acquired on previous days from the Berkwitts would appear to have become Horton's property by virtue of his purchase thereof. It would seem doubtful that the appellants would have removed tapes that did not belong to them which would strongly suggest that those tapes which they did remove had so recently been brought to Indiana that the purchase by Horton had not been completed and the Berkwitts were attempting only to protect their own property interests.

We cannot say there was not sufficient evidence from which the jury could have reached a conclusion that the total number of tapes shown to have been transported on the 18th was 2289.

*The Value of Each Tape.*

This court has not yet ruled upon the meaning of "market value" in 18 U.S.C. § 2311 under circumstances such as presented here.[7] Other courts have addressed this

---

**5.** 18 U.S.C. § 2314 provides in relevant part:
Whoever transports in interstate or foreign commerce any goods, wares, merchandise . . . of the value of $5,000, or more, knowing the same to have been stolen . . .
 \* \* \* \* \* \*
Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

**6.** The Government originally claimed that the tapes appellants *expected* to transport as well as those tapes appellants did transport on the 18th should have been aggregated to meet the $5,000 limitation. In light of the fact that

Count One of the indictment charged only misconduct occurring on the 18th, such an aggregation would be improper as would the aggregation of the tapes transported prior to the 18th.

**7.** 18 U.S.C. § 2311 provides, in relevant part:
As used in this chapter:
 \* \* \* \* \* \*
"Value" means the face, par, or market value, whichever is greater, and the aggregate value of all goods, wares and merchandise . . . referred to in a single indictment shall constitute the value thereof.

issue and have reached widely varying results. Some look to the value the stolen property would have had in the legitimate retail market. *E. g., Cave v. United States*, 390 F.2d 58, 67 (8th Cir. 1968), *cert. denied*, 392 U.S. 906, 88 S.Ct. 2059, 20 L.Ed.2d 1365; *Herman v. United States*, 289 F.2d 362, 366 (5th Cir. 1969), *cert. denied*, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93. A strong argument can be made for the use of this formula in the present case because there was testimony that the packaging of the Berkwitt tapes was counterfeited to look like the legitimate product. Thus, it could be said the appellants' products competed with their legitimate counterparts. Moreover, some courts have pointed out that because the only relevant market for bootlegged goods may be the "black market" which does not accurately reflect the "actual worth" of the stolen goods, the jury is free to apply any reasonable valuation system it wishes. *United States v. Drebin*, 557 F.2d 1316, 1331–32 (9th Cir. 1977), *cert. denied*, 436 U.S. 904, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978). Thus, the jury could have reasonably applied the legitimate retail market valuation system to these tapes to reach the required amount.[8] However, we think this valuation system could lead to misleading results in the present case for it would include a profit margin appellants reasonably could never have obtained in the illegitimate market.[9]

Other courts have applied the wholesale value of the stolen property to decide whether the $5,000 minimum was met, *e. g., United States v. Tippett*, 353 F.2d 335, 338 (4th Cir. 1965), *cert. denied*, 383 U.S. 908, 86 S.Ct. 889, 15 L.Ed.2d 664 (1966). There are two reasons this valuation might be appropriate in the present circumstances; first, because appellants were in fact wholesalers, and second, because the "victims" of appellants, the copyright holders, were also wholesalers. The first reason above would lead to the application of the price at which the appellants sold their tapes to Horton, the illegitimate wholesale value, as the proper market value of the tapes. However, use of this method might also cause misleading results because the value so determined would fail accurately to reflect the price the "willing buyer would pay the willing seller" at any time during the property's receipt and concealment, which is the test under 18 U.S.C. § 2311. *Riso v. United States*, 405 F.2d 134, 137 (7th Cir. 1968), *cert. denied*, 394 U.S. 959, 89 S.Ct. 1306, 22 L.Ed.2d 560 (1969), *and see United States v. McMahan*, 548 F.2d 712, 714 (7th Cir. 1977), *cert. denied*, 430 U.S. 986, 97 S.Ct. 1685, 52 L.Ed.2d 381. In other words, appellants could have sold directly to the public and have received a "profit" of which this wholesale valuation would fail to take account. The second reason above would lead to the valuation of the tapes at the legitimate wholesale market price which is established by the testimony of record company executives at approximately $3.83. Applying this value approach would also exceed the limitation.

The decision of which market valuation method to use in this case is complicated by the fact that most prior cases have involved the interstate transportation of stolen property that was tangible. In the present case, on the other hand, the physical objects transported were tapes which the appellants had legally acquired, and the stolen materials were the sound waves which had been transferred to the tapes. Thus, the valuation methods used in the more traditional "garden variety" § 2314 prosecutions are not necessarily applicable here, and vice versa.

---

**8.** The Government introduced the testimony of record company executives that the retail list price of the tapes on the legitimate market could have been as high as $6.95 to $7.98 a tape with the discount retail price, that is usually the actual selling price to the majority of the public, at a few dollars less, *i. e.*, $3.95 to $4.98. Even taking the $3.95 value times the 2,289 tapes reveals the $5,000 limitation is exceeded.

**9.** As stated in footnote 8, the lowest legitimate retail value would have been $3.95; yet it is clear from the record that the highest price the appellants could have obtained for their tapes was $3.50. *See* discussion, *infra*.

In light of the fact that the $5,000 limitation was not intended to protect those who transport stolen property but to avoid overtaxing the Department of Justice, *McMahan, supra* at 714, *Riso, supra* at 137, we think the proper valuation method in the present case is to apply the retail value of the tapes in what has been urged as an alternative by the appellants, the "thieves market." *See Drebin, supra* at 1328. The thieves market approach is appropriate because it incorporates only a profit margin the appellants could have obtained. Utilizing the retail thieves market price as opposed to wholesale price also accurately portrays the full price the willing buyer in this market would have paid the willing seller in the same market for the appellants' products. The thieves market retail price was sufficiently established by Horton's testimony at trial to be $3.50, the price for which Horton sold the tapes to the public. Using this valuation method, it is clear the $5,000 limitation is exceeded by more than $3,000.00.

A problem still exists, however, as to whether we should subtract an amount representing the appellants' costs because at least a portion of the $3.50 was attributable to non-stolen parts of the tapes. Appellants argue that the Government failed to present any evidence as to these costs, thus that the jury was unreasonable in concluding that more than $5,000 worth of stolen goods was involved.

█ Although we agree that the Government's case could have been stronger on this issue, we think the jury was presented with adequate evidence on which to base its verdict. The jury was instructed that what was stolen was the *fixation of recorded sounds*, not the tangible component parts of the tapes. Furthermore, the appellants argued to the jury that the appropriate valuation of the tapes should be the lost profits to the copyright holders, which demanded

the jury's consideration of costs. Evidence of these costs was presented to the jury in the testimony of one record company executive who testified that the manufacturing costs for a legitimate record album (presumably a single disc) were about $0.75 not including royalties, and of another who testified that the manufacturing costs for albums and tapes were essentially equal.[10] Given this evidence, we cannot say the jury acted without an evidentiary basis in deciding that the $5,000 statutory minimum was met.

## RIGHT TO EFFECTIVE REPRESENTATION

Appellant Mark Berkwitt lastly objects that he was denied his right to effective representation because the trial court denied his motion for a continuance and thus he had only 15 days (nine working days because of intervening holidays) to prepare for trial. He argues that because he was represented by an attorney from the Federal Defender Program,[11] who had no choice but to accept this case and who did not accept a fee for his services and thus made no implied warranties of adequate representation, the test for a continuance should posit a lower standard than would apply to privately retained counsel.

█ In *United States ex rel. Williams v. Twomey*, 510 F.2d 634 (7th Cir. 1975), *cert. denied sub nom. Sielaff v. Williams*, 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109, this court held that the test of whether a defendant is given effective assistance of counsel, irrespective of whether that counsel is privately retained or court appointed, depends upon whether that counsel meets the minimum professional standards. *Id.* at 640, *United States v. Brugger*, 549 F.2d 2, 4 (7th Cir. 1977), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2186, 53 L.Ed.2d 231. In evaluating the adequacy of the representation, "much

10. The jury was also informed that appellants sold their tapes to Horton at about $1.25 a tape. Even if the jury were to assume that appellants made no money on these transactions and sold to Horton at their costs, the net amount ($3.50 − $1.25 = $2.25) times the number of tapes (2,289) would meet the statutory minimum amount.

11. Appellant was represented by the same counsel on this appeal.

depends on the nature of the charge, on the evidence known to be available to the prosecution, on the evidence susceptible of being produced at once or later by the defense, and on the experience and capacity of defense counsel." *Williams, supra* at 639. We also noted that no strict standard exists and that the representation provided by counsel who is appointed to his first case on the day of trial may in some circumstances be adequate, though possibly deserving of inquiry. *Id., and see Chambers, supra* 399 U.S. at 53–54, 90 S.Ct. at 1982.

▇ In the present case, we cannot say that the appellant was denied effective counsel or that the district court abused its discretion in denying the continuance. We note that during the 15 day period before trial appellants presented three motions with supporting memoranda. One of these motions was to sever the two trials which the court agreed to consider if counsel was unable to obtain adequate discovery. No such problems arose, apparently, because no further mention was made of this issue by appellants. The record also reveals that appellant's counsel conducted a complete cross-examination of the Government's witnesses. Furthermore, appellant has failed to support his contention with any specific instance of prejudice. It is well established, however, that he may not rely wholly upon conclusory allegations which are not supported by the record. *Neighbors v. United States,* 457 F.2d 795 (9th Cir. 1972).

Nor can we agree that the federal defender panel attorneys should be judged by a different standard than privately retained counsel. Although we have difficulty conceptualizing the relationship between an objective evaluation of an attorney's representation and what warranties he may or may not impliedly make to his client, if we were to apply appellant's logic to the present case, the standards resulting would seem the same for both the private and panel attorneys. If the private attorney impliedly warrants adequate representation by accepting fees, it would seem that the panel attorney warrants the same to the indigent by accepting the position of federal defender and accepting his publicly financed salary.

We regard the record as adequately demonstrating that the appellant's attorney met the minimum professional standards applicable. We do not view the overall issues of this case as particularly complex, the defense knew what evidence the prosecution possessed, the lack of a time delay was not demonstrated as prejudicing the defense in the presentation of further evidence, and the capability of appellant's counsel appears sufficiently adequate from the record. In the absence of any showing of prejudice resulting from the denial of appellant's motion to continue, we do not think the appellant has demonstrated that the trial court abused its discretion.

### CONCLUSION

An appellate court reviewing the record in a criminal case where there has been a jury verdict against the accused must view the evidence in the light most favorable to the verdict rendered and must accept as established all reasonable inferences from the evidence that tend to support the action of the jury. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Frol,* 518 F.2d 1134, 1137 (8th Cir. 1975). Viewing appellants' arguments in light of this standard and for the reasons stated in this opinion, we affirm the judgment of the district court.

AFFIRMED.