# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 02-2059 & 02-2182

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

JASON SLATER and CHRISTIAN MORLEY,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 85—**Matthew F. Kennelly**, *Judge.*

———————

ARGUED DECEMBER 11, 2002—DECIDED NOVEMBER 7, 2003

———————

Before COFFEY, EASTERBROOK, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Defendants Jason Slater and Christian Morley belonged to an organization called "Pirates With Attitudes" (PWA), a group dedicated to the unauthorized dissemination of copyrighted software over the Internet. The FBI disbanded PWA and on May 4, 2000, a grand jury indicted Slater and Morley, along with 15 others, for a single count of conspiracy to commit copyright infringement in violation of 17 U.S.C. § 506(a)(2), 18 U.S.C. § 2319(c)(1), and 18 U.S.C. § 371. Slater entered a guilty plea, and on May 11, 2001, a jury convicted Morley as charged in the indictment. In this consolidated appeal, we

consider the following two issues: (1) whether the district court's denial of a jury instruction on fair use was improper, and (2) whether the district court's valuation of loss for Sentencing Guidelines purposes was clearly erroneous.

# I

PWA was a group of Internet pirates organized in the 1990s with the goal of making vast amounts of copyrighted software freely—and thus unlawfully—available over the Internet. Members paid no money to download the software, but they paid a different kind of price. Each member was required to contribute valuable services in an assembly line-like fashion. "Suppliers," who often had special access to copyrighted programs, supplied the programs to "crackers." Defendant Slater was one such cracker, and it was his job to download the coded computer software program and eliminate the internal copyright protection. Crackers then forwarded the cracked program to "packagers," who tested the software and added descriptive information. Defendant Morley was a packager. Packagers passed the program on to the group's "couriers," who then uploaded the program to the Internet sites maintained by PWA where it was available for downloading by PWA members. One of these sites, which became the focus of the indictment, was known as Sentinel.

In January 2000, the FBI seized the computer hardware supporting Sentinel, which had been hidden in a closet on the campus of a university and operated without the university's knowledge or authorization. The computer contained about 5,000 programs available for downloading, in addition to files documenting uploading and downloading activity by members beginning in 1996. The FBI initially determined that the total number of programs uploaded to Sentinel during the period charged in the indictment was

54,761, but it later reduced that estimate to 34,582 to take into account nonfunctioning programs.

Slater and Morley, both senior members of PWA, were indicted for a conspiracy that spanned the period between January 1998 and January 2000. As noted above, Slater pleaded guilty, and Morley was convicted by a jury, after which the district court conducted a joint sentencing hearing. The government submitted loss calculations under the 1998 Sentencing Guidelines, which indicates an upward adjustment using the section 2F1.1 tables if the retail value of the loss, calculated by reference to the "infringing items," exceeded $2000. U.S. SENTENCING GUIDELINES MANUAL (U.S.S.G.) § 2B5.3(b)(1) (1998) (referring to the now-repealed § 2F1.1). Infringing items are defined as the items that violate the copyright (*i.e.*, the pirated copies), not the legitimate items that have been copied. Thus, the total retail value of the infringing items can be calculated by multiplying the number of infringing items by their average retail value.

In determining the number of infringing items during the conspiracy charged in the indictment, the government argued that all of the copyrighted software uploaded to Sentinel and each copy of the software downloaded from it between January 1998 and January 2000 should be included. The FBI took a more conservative approach, using a reduced estimate of 34,582 that reflected only the number of functioning uploads, and thus did not include the number of programs downloaded from Sentinel. The district court was more conservative still. It rejected even the FBI's figure as over-inclusive because it had "no confidence" in the government's expert, who it found used questionable, untested theories in arriving at the number of functioning uploads. The district court instead turned to the number of functioning, distinct titles actually remaining on Sentinel at the time of the computer's seizure, which was only 3,947.

Based on a sample of 71 programs, it found that 94% of the extant programs functioned in the same manner as the retail version of the program. Though the selection of the 71 programs was not random, the district court found that it provided a reasonable basis for estimating the actual number of fully functioning programs at the time of the seizure: 94% of 3,947, or 3,710 programs.

With this cautious estimate of the number of infringing items in hand, the district court next calculated the average retail value of the infringing items. In making this calculation, the government presented the actual retail prices for 2,200 of the 3,947 software titles found on Sentinel. Taking into account Slater's own retail pricing data, the district court arrived at an average retail value of $384 per infringing item. The district court was satisfied that this estimate was reasonably accurate for sentencing purposes. By multiplying 3,710 pirated programs by an average retail value of $384, the district court determined that the total retail value of the infringing items was $1,424,640.

On April 19, 2002, the district court sentenced Morley to 24 months imprisonment and Slater to eight months imprisonment and six months community custody with supervised release to follow.

## II

Appellants raise two issues on appeal. First, Morley disputes the district court's denial of a jury instruction on fair use, which we review *de novo*. *United States v. Irorere*, 228 F.3d 816, 825 (7th Cir. 2000). Second, Slater contests the district court's valuation of the infringing items for Sentencing Guidelines purposes, which we review for clear error. *United States v. Vivit*, 214 F.3d 908, 914 (7th Cir. 2000).

### A. Fair Use Instruction

In Morley's case, we find no fault with the district court's denial of a jury instruction on fair use. Federal copyright law contains a fair use exception that limits the exclusive rights of a copyright holder by excepting an otherwise infringing use of a work "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research" upon consideration of the following factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

Morley urges us to find that PWA's use of copyrighted software falls within the fair use exception. He asserts that the Sentinel site was noncommercial—merely for educational and entertainment purposes. It was "noncommercial" because members did not have to pay to download the software; it was "educational" because defendants learned something from using the software, one of the individuals operating the site was a professor, and the hardware was located at a university.

We are unpersuaded—indeed, in our view these arguments barely pass the straight-face test. While members did not have to pay in hard currency to download the software, they did have to contribute valuable services—a barter form of payment—to receive commercially available software. Morley's reliance on *Sony Corp. v. Universal City Studios,*

*Inc.* is thus inapposite, because the transaction was not purely noncommercial. 464 U.S. 417, 449 (1984) (commercial use of copyrighted material is presumptively unfair use). Morley's attempt to establish an educational purpose also strains credulity. The professor who operated the site did so without the knowledge or authorization of the university, and he kept the computer hidden in a closet.

Even if Morley could show some noncommercial educational purpose, consideration of other factors weighs decisively against application of the fair use doctrine to Internet piracy. Limited copying may be permissible for certain noncommercial, educational purposes, taking into account the nature of the copyrighted work and market considerations. 17 U.S.C. § 107; *Sony*, 464 U.S. at 448-50. See also Stephen M. McJohn, Fair Use of Copyrighted Software, 28 Rutgers L. J. 593, 603-06 (1997). These factors, however, weigh against application of the fair use doctrine to cases involving Internet piracy. PWA allowed members to obtain unlawful, digital duplicates of thousands of commercially available software programs. The government also presented expert testimony on the harmful effect of Internet piracy on the potential market for the copyrighted work, though we think this point is fairly obvious. See generally *In re Aimster Copyright Litigation*, 334 F.3d 643 (7th Cir. 2003). It is preposterous to think that Internet piracy is authorized by virtue of the fair use doctrine. For these reasons, we affirm the district court's denial of a jury instruction on fair use.

## B.  Valuation of Loss

We now turn to Slater's claim, which fares no better than Morley's. Under the 1998 Sentencing Guidelines, the defendant's sentence is enhanced according to the table in section 2F1.1 if the retail value of the loss exceeded $2000.

U.S.S.G. § 2B5.3(b)(1) (1998). The value of the loss is measured by the retail value of the "infringing items," defined as "the items that violate the copyright or trademark laws." *Id.* at cmt. n.1. (The Sentencing Guidelines have since been amended, but those amendments have no effect on the present case. The May 2000 amendments provide that the value of the loss is to be measured according to the retail value of the "infringed item." See § 2B5.3, cmt. n.2 (2002). Infringing items are distinguishable from "infringed items," which are "the legitimate items that are infringed upon." U.S.S.G. app. C (2002). The total value of the infringing items can be calculated by multiplying the number of infringing items by their average retail value.)

In this case, neither the government nor Slater disputes the district court's exceedingly conservative finding of the number of infringing items. The issue raised on appeal is whether the district court's valuation of the infringing items is clearly erroneous. *Vivit*, 214 F.3d at 914.

In nonsoftware cases, this court has calculated the value of infringing items based on the retail value of those goods on the black market—"the full price the willing buyer in this market would have paid the willing seller in the same market for the appellants' products." *United States v. Oberhardt*, 887 F.2d 790, 792-93 (7th Cir. 1989) (document); *United States v. Bakken*, 734 F.2d 1273, 1278 (7th Cir. 1984) (antifreeze); *United States v. Berkwitt*, 619 F.2d 649, 658 (7th Cir. 1980), *abrogated on other grounds*, *Dowling v. United States*, 473 U.S. 207 (1985) (bootlegged tapes). Other circuits also follow this approach. *United States v. Guerra*, 293 F.3d 1279, 1292 (11th Cir. 2002) (cigars); *United States v. Bao*, 189 F.3d 860, 867 (9th Cir. 1999) (Microsoft Windows 95 manuals). But see *United States v. Larracuente*, 952 F.2d 672, 674-75 (2d Cir. 1992) (applying the normal retail price of movies rather than the lower price of counterfeit copies). This assumes, importantly, that the infringing

item is somehow distinguishable from and less valuable than the original. Neither assumption, as we shall see, necessarily applies to digital copies that have been purged of copy-protection features and thus are easier to replicate than the originals.

Slater argues that black-market approach ought to govern here. Because members paid nothing to download the programs, he further claims that the retail value of the infringing items should be zero. The district court, however, correctly rejected a zero value for the infringing items. Zero reflects neither the price paid to acquire the program (*i.e.*, the value of the member's services) nor the retail value of a digital duplicate of the original copyrighted software.

The district court instead accepted the government's approach, finding that in the particular case of almost exact digital copies, it was appropriate to value the infringing items by reference to the normal retail price of the *bona fide* copyrighted software. Based on the evidence, it calculated the average retail value as $384 per infringing item. While we recognize that $384 equates the retail value of the "infringing item" with the retail value of the "infringed item,"this was an acceptable choice in this situation, where the infringing item is the virtual equivalent of the infringed item.

The district court properly understood that it was assessing the retail value of the infringing items—not the retail value of the infringed items. Section 2F1.1 of the Sentencing Guidelines gives the district court considerable leeway in assessing the retail value of the infringing items.

> For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information.

U.S.S.G. § 2F1.1, cmt. n.8. Unlike more conventional infringement cases, such as those we faced in *Oberhardt*, *Bakken*, and *Berkwitt*, *supra*, here there was no evidence of the value of the pirated copies on the black market. We agree with the district court that the pirated copies were certainly worth more than a retail value of zero. For this reason, it is not appropriate to apply any rule of lenity, such as the one used in the Ninth Circuit under which the court selects "the value bringing lesser punishment" where "two prices are equally good measures of the actual or intended loss to the victim." *United States v. Hardy*, 289 F.3d 608, 614 (9th Cir. 2001). Here, a value of zero is not an "equally good measure" of loss.

Instead, we join the Fifth Circuit and find that where there is little or no evidence of the value of the infringing item, the court may consider the retail value of the infringed item. *United States v. Kim*, 963 F.2d 65, 69-70 (5th Cir. 1992). In this case, the pirated programs were digital duplicates of the original copyrighted program, providing reasonable justification for the district court's reliance on the normal retail price of the software. See *Larracuente*, 952 F.2d at 674 (where "unauthorized copies are prepared with sufficient quality to permit their distribution through normal retail outlets, the value of the infringing items is their normal retail price to ultimate consumers who purchase from such outlets").

We are further mindful that the total value of the loss for sentencing purposes depends not only on the retail value of the infringing item, but also on the number of infringing items. Here the district court used an exceptionally conservative estimate of the number of infringing items—looking not at the total number of downloads or uploads for the period charged, but only at the number of programs actually remaining on Sentinel at the time of the hardware's seizure. Because the district court used a considerably lower figure for the number of infringing items than the

evidence might have supported, its reliance on the normal retail price to arrive at the total value of the loss was not clearly erroneous.

### III

For the reasons discussed, we hold that the district court's denial of a jury instruction on fair use was proper, and the district court's valuation of loss for Sentencing Guidelines purposes was not clearly erroneous. The judgment of the district court is AFFIRMED.

A true Copy:

    Teste:

 

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*