In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1314

BMG MUSIC, *et al.*,

*Plaintiffs-Appellees*,

*v.*

CECILIA GONZALEZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 03 C 6276—**Blanche M. Manning**, *Judge*.

ARGUED OCTOBER 27, 2005—DECIDED DECEMBER 9, 2005

Before EASTERBROOK, EVANS, and WILLIAMS, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*.  Last June the Supreme Court held in *MGM Studios, Inc. v. Grokster, Ltd.*, 125 S. Ct. 2764 (2005), that a distributed file-sharing system is engaged in contributory copyright infringement when its principal object is the dissemination of copyrighted material. The foundation of this holding is a belief that people who post or download music files are primary infringers. *In re Aimster Copyright Litigation*, 334 F.3d 643, 645 (7th Cir. 2003), which anticipated *Grokster*, made the same assumption. In this appeal Cecilia Gonzalez, who downloaded copyrighted music through the KaZaA file-sharing network, denies the premise of *Grokster* and

*Aimster*. She contends that her activities were fair use rather than infringement. The district court disagreed and granted summary judgment for the copyright proprietors (to which we refer collectively as BMG Music). 2005 U.S. Dist. LEXIS 910 (N.D. Ill. Jan. 7, 2005). The court enjoined Gonzalez from further infringement and awarded $22,500 in damages under 17 U.S.C. §504(c).

A "fair use" of copyrighted material is not infringement. Gonzalez insists that she was engaged in fair use under the terms of 17 U.S.C. §107—or at least that a material dispute entitles her to a trial. It is undisputed, however, that she downloaded more than 1,370 copyrighted songs during a few weeks and kept them on her computer until she was caught. Her position is that she was just sampling music to determine what she liked enough to buy at retail. Because this suit was resolved on summary judgment, we must assume that Gonzalez is telling the truth when she says that she owned compact discs containing some of the songs before she downloaded them and that she purchased others later. She concedes, however, that she has never owned legitimate copies of 30 songs that she downloaded. (How many of the remainder she owned is disputed.)

Instead of erasing songs that she decided not to buy, she retained them. It is these 30 songs about which there is no dispute concerning ownership that formed the basis of the damages award. This is not a form of time-shifting, along the lines of *Sony Corp. of America v. Universal Studios, Inc.*, 464 U.S. 417 (1984) (*Betamax*). A copy downloaded, played, and retained on one's hard drive for future use is a direct substitute for a purchased copy—and without the benefit of the license fee paid to the broadcaster. The premise of *Betamax* is that the broadcast was licensed for one transmission and thus one viewing. *Betamax* held that shifting the time of this single viewing is fair use. The files that Gonzalez obtained, by contrast, were posted in violation of copyright law; there was

no license covering a single transmission or hearing—and, to repeat, Gonzalez kept the copies. Time-shifting by an authorized recipient this is not. See William M. Landes & Richard A. Posner, *The Economic Structure of Intellectual Property Law* 117-22 (2003).

Section 107 provides that when considering a defense of fair use the court must take into account "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." Gonzalez was not engaged in a nonprofit use; she downloaded (and kept) whole copyrighted songs (for which, as with poetry, copying of more than a couplet or two is deemed excessive); and she did this despite the fact that these works often are sold per song as well as per album. This leads her to concentrate on the fourth consideration: "the effect of the use upon the potential market for or value of the copyrighted work."

As she tells the tale, downloading on a try-before-you-buy basis is good advertising for copyright proprietors, expanding the value of their inventory. The Supreme Court thought otherwise in *Grokster*, with considerable empirical support. As file sharing has increased over the last four years, the sales of recorded music have dropped by approximately 30%. Perhaps other economic factors contributed, but the events likely are related. Music downloaded for free from the Internet is a close substitute for purchased music; many people are bound to keep the downloaded files without buying originals. That is exactly what Gonzalez did for at least 30 songs. It is no surprise, therefore, that the only appellate decision on point has held that downloading copyrighted songs cannot be defended as fair use, whether or not the recipient plans to buy songs she likes well enough

to spring for. See *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014-19 (9th Cir. 2001). See also *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000) (holding that downloads are not fair use even if the downloader *already* owns one purchased copy).

Although BMG Music sought damages for only the 30 songs that Gonzalez concedes she has never purchased, all 1,000+ of her downloads violated the statute. All created copies of an entire work. All undermined the means by which authors seek to profit. Gonzalez proceeds as if the authors' only interest were in selling compact discs containing collections of works. Not so; there is also a market in ways to introduce potential consumers to music.

Think of radio. Authors and publishers collect royalties on the broadcast of recorded music, even though these broadcasts may boost sales. See *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979) (discussing the licenses available from performing rights societies for radio and television broadcasts). Downloads from peer-to-peer networks such as KaZaA compete with licensed broadcasts and hence undermine the income available to authors. This is true even if a particular person never buys recorded media. Cf. *United States v. Slater*, 348 F.3d 666 (7th Cir. 2003). Many radio stations stream their content over the Internet, paying a fee for the right to do so. Gonzalez could have listened to this streaming music to sample songs for purchase; had she done so, the authors would have received royalties from the broadcasters (and reduced the risk that files saved to disk would diminish the urge to pay for the music in the end).

Licensed Internet sellers, such as the iTunes Music Store, offer samples—but again they pay authors a fee for the right to do so, and the teasers are just a portion of the original. Other intermediaries (not only Yahoo! Music Unlimited and Real Rhapsody but also the revived Napster,

with a new business model) offer licensed access to large collections of music; customers may rent the whole library by the month or year, sample them all, and purchase any songs they want to keep. New technologies, such as SNOCAP, enable authorized trials over peer-to-peer systems. See Saul Hansell, *Putting the Napster Genie Back in the Bottle*, New York Times (Nov. 20, 2005); see also http://www.snocap.com.

Authorized previews share the feature of evanescence: if a listener decides not to buy (or stops paying the rental fee), no copy remains behind. With all of these means available to consumers who want to choose where to spend their money, downloading full copies of copyrighted material without compensation to authors cannot be deemed "fair use." Copyright law lets authors make their own decisions about how best to promote their works; copiers such as Gonzalez cannot ask courts (and juries) to second-guess the market and call wholesale copying "fair use" if they think that authors err in understanding their own economic interests or that Congress erred in granting authors the rights in the copyright statute. Nor can she defend by observing that other persons were greater offenders; Gonzalez's theme that she obtained "only 30" (or "only 1,300") copyrighted songs is no more relevant than a thief's contention that he shoplifted "only 30" compact discs, planning to listen to them at home and pay later for any he liked.

BMG Music elected to seek statutory damages under 17 U.S.C. §504(c)(1) instead of proving actual injury. This section provides that the author's entitlement, per infringed work, is "a sum of not less than $750 or more than $30,000 as the court considers just." But if an "infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages

to a sum of not less than $200." 17 U.S.C. §504(c)(2). Gonzalez asked the district court to reduce the award under this proviso, but the judge concluded that §402(d) bars any reduction in the minimum award. This subsection provides: "If a notice of copyright in the form and position specified by this section appears on the published phonorecord or phonorecords to which a defendant in a copyright infringement suit had access, then no weight shall be given to such a defendant's interposition of a defense based on innocent infringement in mitigation of actual or statutory damages". It is undisputed that BMG Music gave copyright notice as required—"on the surface of the phonorecord, or on the phonorecord label or container" (§402(c)). It is likewise undisputed that Gonzalez had "access" to records and compact disks bearing the proper notice. She downloaded data rather than discs, and the data lacked copyright notices, but the statutory question is whether "access" to legitimate works was available rather than whether infringers earlier in the chain attached copyright notices to the pirated works. Gonzalez readily could have learned, had she inquired, that the music was under copyright.

If BMG Music had requested more than $750 per work, then Gonzalez would have been entitled to a trial. See *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340 (1998). What number between $750 and $30,000 is "just" recompense is a question for the jury, unless both sides agree to decision by the court. But BMG Music was content with $750 per song, which the district judge awarded on summary judgment. Gonzalez contends that this was improper: *Feltner*, she contends, holds that a jury must decide whether even the statutory minimum award will be allowed.

*Feltner* holds that a claim for statutory damages under §504(c) is a suit at law to which the seventh amendment applies. This does not mean, however, that a jury must resolve every dispute. When there are no disputes of

material fact, the court may enter summary judgment without transgressing the Constitution. See *Fidelity & Deposit Co. v. United States*, 187 U.S. 315 (1902). See also *Galloway v. United States*, 319 U.S. 372 (1943); *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931). While acknowledging this proposition, Gonzalez insists that copyright cases are different. She relies entirely on a single passage from *Feltner*: "The right to a jury trial includes the right to have a jury determine the *amount* of statutory damages, if any, awarded to the copyright owner." 523 U.S. at 353 (emphasis in original). Gonzalez maintains that by adding "if any" the Court allowed a jury to send an author home empty handed, even if the statute makes $750 the minimum. In other words, she contends that *Feltner* creates a system of jury nullification unique to copyright litigation.

The Justices did not purport to give defendants in copyright cases the right to ask jurors to return verdicts in the teeth of the law. The sentence we have quoted is a general description of the jury's role, which the Court drew from seventeenth-century English jurisprudence. That's hardly a plausible source for a rule unique to American copyright law. In *Feltner* neither side had sought summary judgment. We read *Feltner* as establishing no more (and no less) than that cases under §504(c) are normal civil actions subject to the normal allocation of functions between judge and jury. When there is a material dispute of fact to be resolved or discretion to be exercised in selecting a financial award, then either side is entitled to a jury; if there is no material dispute and a rule of law eliminates discretion in selecting the remedy, then summary judgment is permissible. See *Segrets, Inc. v. Gillman Knitwear Co.*, 207 F.3d 56, 65 n.7 (1st Cir. 2000).

Gonzalez says that the ninth circuit understood *Feltner* differently on remand, but that's mistaken. A jury trial was held—for there were material factual disputes—and the

jury returned a verdict of $31.68 million in statutory damages (or $72,000 per infringed work, an award made possible by the jury's conclusion that infringement had been wilful). The defendant, ruing its Pyrrhic victory in the Supreme Court (the judge's original award, which the Court vacated, had been $8.8 million), maintained that §504(c) is unconstitutional, and that only actual damages may be awarded, because §504(c) does not provide for a jury trial. The court of appeals rejected that contention, noting that after the Supreme Court's decision a jury trial had been held. See *Columbia Pictures Industries, Inc. v. Krypton Broadcasting of Birmingham, Inc.*, 259 F.3d 1186, 1192-93 (9th Cir. 2001). Whether a jury resolves the dispute because of statutory language or because of the seventh amendment is all the same to the litigants. It is not possible to find, in a decision affirming a jury's verdict, a rule of law that a jury is required even when there are no factual disputes to resolve and no discretion to exercise.

As for the injunction: Gonzalez contends that this should be vacated because she has learned her lesson, has dropped her broadband access to the Internet, and is unlikely to download copyrighted material again. A private party's discontinuation of unlawful conduct does not make the dispute moot, however. An injunction remains appropriate to ensure that the misconduct does not recur as soon as the case ends. See *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953). The district court did not abuse its discretion in awarding prospective relief.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*