**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Paul T. WIGODA, Defendant-Appellant.**

**No. 74–2007.**

United States Court of Appeals,
Seventh Circuit.

Heard April 10, 1975.

Decided Aug. 20, 1975.

Rehearing En Banc
Nov. 6, 1975.

Sherman C. Magidson, Warren Wolfson, Harry J. Busch, Chicago, Ill., for defendant-appellant.

Samuel K. Skinner, U. S. Atty., Gary L. Starkman, Jeremy D. Margolis, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, CUMMINGS, Circuit Judge, and BRYAN, Senior District Judge.*

CUMMINGS, Circuit Judge.

In April 1974, an indictment was returned against defendant, the alderman representing the 49th Ward of the City of Chicago. The second count of the indictment charged that defendant subscribed to a false income tax return for 1969 by substantially under-reporting his gross income in violation of 26 U.S.C. § 7206(1).[1] The jury found defendant

---

* Senior District Judge Frederick vanPelt Bryan of the Southern District of New York is sitting by designation.

1. Count one of the indictment charged extortion in violation of the Hobbs Act (18 U.S.C. § 1951) but was dismissed on motion of the Government prior to trial because of the panel decision in *United States v. Stasczuk*, 502 F.2d 875 (7th Cir. 1974). Presumably count one would not have been dismissed if the *en banc* opinion in that case, 517 F.2d 53 (7th Cir., decided May 16, 1975), had been rendered at the time of this trial.

guilty and the district judge imposed a one-year prison sentence. This appeal followed. We affirm.

## I. *Sufficiency of the Evidence*

█ In a somewhat half-hearted way, defendant contends that his motions for a judgment of acquittal should have been granted on the ground that the evidence was insufficient to establish his guilt beyond a reasonable doubt. This necessitates a summation of the important evidence. Of course, this Court does not make its own credibility determinations, so that the evidence and inferences most favorable to the Government's case are accepted. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680.

On July 19, 1965, Roy Gottlieb and Kenneth Tucker signed an agreement to purchase the Edgewater Golf Club in Chicago for $7,600,000. They deposited earnest money of $200,000. Although the balance of the purchase price was supposedly to be paid by November 1, 1966, the buyers exercised their right under the contract to pay an additional $200,000 deposit, thus extending the due date on the remaining $7,200,000 balance until November 1, 1967.

The contract permitted a further extension of the time for payment of the balance until November 1, 1968, if a third party initiated proceedings to downgrade the R–4 zoning classification of the property, which existed in 1965. The R–4 classification permitted the building of residence structures, including multi-family dwellings, and certain non-business structures such as libraries, churches and cemeteries. Gottlieb and Kenneth Tucker needed to secure a new, more permissive zoning classification before they could build their planned regional shopping center complex. Attorney Robert Haskins was retained to secure the rezoning. He ultimately received approximately $248,000 in fees for his work on the project.

In May 1967, Haskins filed an application with the City Council of Chicago requesting upgrading of the property's zoning to the planned development classification which would permit the construction of the shopping center, high-rise apartment units and a number of townhouses. Early the next month, the application was referred to the Chicago Plan Commission and the Council's Committee on Buildings and Zoning. Defendant sat on both bodies; his 49th Ward bordered the ward containing the land in question.

At the June hearings of the Chicago Plan Commission and the Committee on Buildings and Zoning of the Council, Alderman Jack Sperling of the 50th Ward, where the property was located, and others opposed the rezoning. Defendant successfully favored deferment of the proposal's consideration.

In late October 1967, Haskins and Gottlieb visited defendant in his office and suggested that he file an application to downgrade the zoning so that the developers would have another one-year extension of time to raise the $7,200,000 balance instead of forfeiting the $400,000 already paid. Two days later defendant introduced an ordinance to downgrade the zoning from R–4 to R–2, permitting only the construction of single-family residences. Simultaneously, three other aldermen on record as opposed to the development plan co-sponsored a virtually identical downzoning ordinance. Thus the developers gained an additional year in which to secure the needed $7,200,000 to complete their purchase. Defendant never followed through on his proposed downzoning ordinance, so that it died in committee.

Before the spring of 1968, Gottlieb returned to defendant's office to discuss the Edgewater property. He reminded defendant about the June 1967 hearing on the developers' upgrading application. Gottlieb testified that he told the defendant that "if we didn't get the property zoned that I didn't think anyone would ever make any money out of the project" (Tr. 267). Defendant agreed to determine why no action had been taken on that application.

Before the November 1, 1968, deadline, the developers secured the necessary $7,200,000 and the sale of the Edgewater property was consummated.

At a January 17, 1969, hearing of the Chicago Plan Commission, defendant voted to approve the planned development, as revised in late 1968 or early 1969, although he had previously sponsored the downzoning ordinance. Until this time, defendant had repeatedly advocated the acquisition of the Edgewater property by some public agency so that it could be preserved as open space for public use.

On January 23, 1969, Haskins presented the case of the developers before the City Council's Committee on Buildings and Zoning. As a member, defendant witnessed the presentation. Subsequently, he voted with a majority of that committee to recommend approval of the planned development by the full City Council.

Soon after the committee hearing, Philip Krone, a consultant of the Illinois Department of Conservation, visited defendant in his office and urged him to table the planned development of the Edgewater property, so that it could be purchased by the State for $9,500,000 in view of its then R–4 zoning. Krone informed the defendant that a bill to purchase the land for recreational purposes was to be introduced in the State legislature. Defendant was hostile to Krone's suggestion. The rezoning sought by the developers would increase the cost of the land to any public purchaser.

On March 14, 1969, the Edgewater planned development was approved by the full City Council. Even though, as noted earlier, he had previously introduced the downzoning ordinance and had openly favored the dedication of the property to public use, defendant spoke and voted in favor of the revised, planned development. Other aldermen with wards contiguous to that containing the Edgewater property voted to disapprove the proposed rezoning, in accord with their consistently advocated view

that the public should have the benefit of the open land.

Prior to the passage of the ordinance and afterwards, Haskins discussed the Edgewater property with defendant. Haskins and Gottlieb subsequently met in Haskins' office to discuss the property, and later Gottlieb and Kenneth Tucker met seriatim about the project.

On April 7, 1969, Kenneth Tucker and his uncle, Oscar Tucker, met at the bank where Oscar Tucker maintained a safety deposit box containing a large sum of cash under the name Oscar Goldman. Oscar Tucker gave his nephew $50,000 in $100 and $50 bills from the box. Kenneth Tucker displayed this money to Gottlieb in the former's office. They recounted it, put it in an envelope and locked it in Kenneth Tucker's office safe.

On April 8, 1969, Gottlieb and Haskins met at Haskins' office and Gottlieb handed the lawyer a sealed envelope containing the $50,000. Thereafter Haskins telephoned and then visited defendant's office where he handed him the sealed envelope, telling defendant that "Gottlieb wanted me to give you this." Defendant did not report that $50,000 as income.

On December 9, 1969, defendant moved the City Council to consider a resolution asking the Governor of Illinois to implement acquisition of the property pursuant to prior legislation. This resolution was passed unanimously, and the rezoned land was sold to the State of Illinois and the Chicago Public Buildings Commission for a total price of $18,300,000, giving the developers an approximate net profit of $6,000,000. Three to four million dollars of that profit derived from the increased value of the land caused by the 1969 rezoning which defendant had favored in two committees and in the final council vote.

At the trial, Haskins testified that on April 8 he delivered to defendant the same envelope he had received from Gottlieb. He told the jury that an envelope containing 500 $1.00 bills was

about the same size and weight as the envelope he delivered to defendant.

■ In *United States v. Ernest, Inc.,* 509 F.2d 1256, 1261 (7th Cir. 1975), we discussed circumstantial evidence as follows:

> "Where the evidence is circumstantial it is not necessary that it be such as to exclude every reasonable hypothesis other than that of guilt. As with direct evidence, it is only necessary that the jury be convinced of guilt beyond a reasonable doubt." (Citations omitted.)

Thus there is no requirement that circumstantial evidence, in order to sustain a guilty verdict, must exclude every reasonable hypothesis but that of guilt. All that is necessary is that such evidence convince the jury beyond a reasonable doubt of the defendant's guilt. *Holland v. United States,* 348 U.S. 121, 139–140, 75 S.Ct. 127, 99 L.Ed. 150. A guilty verdict must be upheld on an insufficiency of the evidence challenge "if a rational trier of fact could have found beyond a reasonable doubt" that defendant committed the crime charged. *United States v. Scher,* 476 F.2d 319, 320 (7th Cir. 1973).

■ Applying these principles and viewing the evidence in the light most favorable to the Government, the jury could properly find that defendant received a $50,000 cash payment in return for his assistance with respect to the Edgewater property and that he did not report this sum on his 1969 income tax return.

## II. *Restrictions on Cross-Examination*

Defendant contends that his counsel could not effectively cross-examine Messrs. Haskins, Gottlieb and Tucker because the district judge did not permit him to examine an Internal Revenue Service report on Haskins and pretrial statements furnished to the Government by Haskins, Gottlieb, Kenneth Tucker and another. Defendant relies on both *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and the Jencks Act (18 U.S.C. § 3500).

■ The IRS document in question was Special Agent Richard Starr's report on Haskins' civil and criminal tax liability. Government counsel submitted this report to the trial judge for *in camera* inspection, advising him that nothing in the report was relevant to Wigoda's trial. The prosecutor conceded that if the cross-examination of Haskins disclosed that anything in the report was relevant, the court could give defendant access to the report without objection. This procedure comported with 18 U.S.C. § 3500(c). The judge stated that he would read the report before Haskins was examined and would make it accessible to defense counsel "in the event during the cross-examination [of Haskins] I feel there is material in here that the defendants [lawyers] are entitled to, either under *Brady* or by virtue of disclosing some undisclosed motivation or interest" (Tr. 38).

After Haskins' direct examination, the court supplied defense counsel with considerable information from the Starr report, though not the full report itself, for the purpose of cross-examination. Thus the court stated, quoting from the Starr report:

> "In summary, of the $110,517.49 total receipts not deposited, $67,000.00 was received in currency, and $43,517.49 was received by checks. These checks were either cashed by Haskins, endorsed over to third parties to pay incurred debts, or were deposited into his wife's account at the Beverly Bank." (Tr. 463.)

Defense counsel was also advised by the court that the breakdown of the unreported legal receipts not deposited by Haskins was $47,600 for 1968, $38,417.49 for 1969, and $24,500 for 1970. As the court also revealed, the report showed that during his conversations with an IRS agent "Haskins said he did not include certain non-deposited legal receipts in the audit and he said he forgot to report it" (Tr. 468). The judge stated that in the tax years 1968–1970 Haskins failed to report 54% of his total income and that he had not been immunized

from prosecution with respect to his tax liability. Finally, the judge informed counsel that the report showed that Haskins did not include in his return profits and loss from the Edgewater partnership in which he held a 3% interest. (Tr. 129, 460–469.) This information resulted in a stipulation read to the jury as to what Special Agent Starr would testify if called as a witness. The stipulation showed that Starr had prepared a report of Haskins' criminal tax liability reflecting a finding of unreported legal income as stated above. The stipulation also showed that when he was confronted by a revenue agent with certain unreported items, Haskins admitted these non-deposited items were not included in the gross receipts of his partnership returns and that certain profits and loss from the Edgewater limited partnership were not included in his tax returns for 1969 and 1970. (Tr. 801.)

Defendant does not deny that before trial his counsel were also furnished by the Government with a memorandum detailing the tax negotiations between the Government and Haskins. According to the Government's uncontroverted brief, this memorandum set forth "the precise nature of the assurances" made to Haskins. The memorandum is summarized as follows in the Government's brief:

"Thus, the defense was advised that Haskins had engaged in a series of discussions with representatives of the United States Attorney's Office and the Internal Revenue Service, that Haskins was initially advised that information which he provided would not be used against him and that the United States Attorney's Office would recommend that he not be prosecuted for criminal tax matters then under investigation. The memorandum disclosed that Haskins withdrew his voluntary cooperation and that his attorney was then advised that the criminal tax matters would take their normal course through the Justice Department. It related the application for an entry of an immunity order and explained that the United States At-

torney's Office had informed the Department of Justice Tax Division that, in its opinion, Haskins' tax investigation should take its normal course but that prosecution should be handled by a Tax Division Attorney rather than one from this office [U. S. Attorney for the Northern District of Illinois]. The memorandum also made it clear that Haskins' attorney was aware that the tax case would be unaffected by the testimony elicited pursuant to the immunity order." (Br. 19–20.)

■ Special Agent Starr's report is contained in sealed material furnished as part of the record on appeal. We have read the report and conclude that it does not include material exculpating defendant under the rule of *Brady v. Maryland, supra.* Furthermore, the information from the report provided to defendant's counsel after an *in camera* inspection satisfied the disclosure requirements of the Jencks Act. Thus the district court's decision that the full report need not be revealed under the Jencks Act was not "clearly erroneous." *United States v. O'Brien,* 444 F.2d 1082, 1087 (7th Cir. 1971).

Together with the pretrial memorandum of the negotiations between the Government and Haskins, the information supplied by the trial court provided defendant with the necessary material to probe both Haskins' financial condition and any governmental promises or pressures. As in *United States v. DeLeon,* 498 F.2d 1327, 1332–1333 (7th Cir. 1974), the court advised defendant's counsel that they would be allowed to cross-examine Haskins as to other payoffs which he may have made in connection with zoning matters (Tr. 133–134), but the relevant questions were never asked. Wigoda's counsel were provided with enough facts from the Internal Revenue Service report and from the Government's memorandum of negotiations to cross-examine Haskins adequately. His financial status and tax problems were fully developed on cross-examination and in closing argument. Further access to infor-

mation in the IRS report was unnecessary and would not have furthered Wigoda's case.

■ Again relying on the Jencks Act and *Brady v. Maryland, supra,* defendant claims he was entitled to examine the pretrial statements of witnesses Haskins, Gottlieb, Kenneth Tucker, and Leonard Ash, the last of whom served as vice-president and corporate counsel for Gottlieb's and Tucker's company, Kenroy, Inc. These statements were submitted to the trial court for *in camera* inspection pursuant to 18 U.S.C. § 3500(c). We have examined them and agree that they do not relate to the Edgewater Golf Club matter and would not aid defendant. Thus the district court's ruling that the witnesses' statements were non-producible under the Jencks Act because they did not relate to areas explored on direct examination was not "clearly erroneous." See *United States v. O'Brien, supra.*

Defendant also asserts that the court's refusal to turn over the statements of these witnesses violated his rights to due process under *Brady v. Maryland, supra.* Defendant contends that if the statements of Haskins or the others showed that Haskins had pretended to act as the middleman in other payoffs and had instead kept the money himself, that material would be producible under *Brady* because it would support the defense theory of the instant case that Haskins had never passed the $50,000 to defendant, but had kept it himself. Our inspection of the statements of the witnesses indicates that there was absolutely no indication that Haskins had acted as an unreliable middleman in any other payoff. Haskins' statements show only that he assertedly passed money to a county official on behalf of other clients with respect to other real estate. The statements of the other three witnesses concern the so-called Pauling property in

Elk Grove Village and have no connection with Haskins. A careful examination of these statements satisfies us that the district court correctly ruled that their production was not required under either the Jencks Act or *Brady.*

■ Defendant's counsel claim on appeal that any evidence of Haskins' involvement in another payoff was producible under *Brady* because they might then have called the official involved in the other payoff, since a denial of receipt by him would bolster the defense theory that Haskins did not pass the money on to the defendant.[2] As the Government points out, the admissibility of such extrinsic evidence to attack Haskins' credibility is doubtful. See generally, *United States v. Conrad,* 448 F.2d 271, 274–275 (9th Cir. 1971); Fed.R.Evid. 403 and 608(b). If they did not lead to admissible evidence, the statements certainly could not have been material in the *Brady* sense. Moreover, it is again noteworthy that even though the trial judge announced that defense counsel could ask Haskins whether he paid money to other officials in other zoning matters without mentioning names and defense counsel indicated that they would so ask, such questions were not put, presumably as a matter of trial strategy.[3] See *United States v. Cook,* 432 F.2d 1093, 1101–1102 (7th Cir. 1970), certiorari denied, 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535. Finally, the district court indicated that the defense could explore the existence of unrelated payoffs on cross-examination, but that no names of alleged recipients of payoffs could be mentioned. The "trial" of another public official, as contemplated by the defendant's argument on appeal that such an official might have been called as a witness to deny receipt of a payoff supposedly made by Haskins, exemplifies the introduction of confusing and potentially prejudicial collateral issues which

2. In the court below, defendant's counsel did not suggest this possible use of the statements in the colloquy before the court's ruling.

3. It is easy to imagine the damage that might be done to defendant's case if it was revealed

on cross-examination that Haskins had made similar payoffs to other public officials. The decision to forego such a revelation, especially since Haskins was already thoroughly impeached, is understandable.

the district court sought to avoid in refusing to reveal to defendant's counsel the contents of the witnesses' statements, which were not relevant to their direct testimony.

■ In sum, nothing in these statements indicate that Haskins defrauded any clients by retaining bribes rather than passing them along to public officials. Likewise, nothing in them reveals anything about government promises of non-prosecution. Since Haskins was thoroughly impeached by his own testimony regarding his conduct and since defense counsel chose not to explore the possibility of other payoffs on cross-examination, it cannot be said that the district court's decision not to disclose these documents denied Wigoda a fair trial within the ambit of *Brady.*

### III. *Closing Argument*

During the course of the trial the jury learned that conversations had been held between Gottlieb and defendant, Haskins and defendant, and Haskins and Gottlieb with respect to the Edgewater property. The Government did not attempt to introduce the contents of at least one of the Haskins-defendant conversations, and the district judge refused to admit into evidence the substance of the Haskins-Gottlieb conversations which took place two or three weeks after the rezoning ordinance was passed and before the $50,000 was delivered to Wigoda.[4]

In his closing argument, the prosecutor called the jury's attention to a conversation between Gottlieb and defendant in late 1967 or early 1968 where Gottlieb allegedly "got the message across" that defendant could expect remuneration for his help. The prosecutor also referred to a conversation between Haskins and defendant and to a subsequent conversation between Haskins and Gottlieb which led to procurement of the

$50,000. Then, after referring to Gottlieb's testimony, the prosecutor stated as follows:

"Now, it doesn't really matter what took place in those conversations between the parties that were not admitted into evidence. However, you, the eleven jurors, may use your common sense and you may call upon your own human experience and common sense and I don't think you [will] have any difficulty in inferring what was said in these conversations."

After this statement, defendant's counsel objected. Thereupon, the following colloquy occurred between defendant's counsel, the trial judge, and the prosecutor:

"Mr. Wolfson [defendant's counsel]: He is asking the jury to infer something from nothing.

"The Court: I think the lawyers are entitled to make such logical inferences as the evidence warrants. It is up to the jury to judge those inferences which are not warranted and they may certainly disregard them.

"All right.

"Mr. Webb [prosecutor]: What was said in these conversations isn't really important because the crime charged in the indictment is a simple crime. The indictment charges Mr. Wigoda received a $50,000 payoff for whatever reason and didn't report it on his tax return."

In denying defendant's motion for a new trial, the district judge stated that it was "reasonably clear" that the prosecutor's questioned remark was improper because the Government had not offered the Haskins-Wigoda conversation and had offered, but had not been permitted to introduce, the Haskins-Gottlieb conversation. Accordingly, he ruled that the prosecutor could not rightly ask the jury to speculate on the content of those

---

**4.** The Government's offer of proof as to the excluded Haskins-Gottlieb conversation did not directly incriminate defendant, but concerned Haskins' telling Gottlieb to obtain $50,-000 because Haskins needed "to spread it

out." The trial judge's apparent reason for refusing the conversation was his determination that its probative value was outweighed by the danger of unfair prejudice to the defendant. See Fed.R.Evid. 403.

conversations.[5] Nevertheless, the trial judge concluded that this error was not sufficiently prejudicial to require a new trial. The court stated that the prosecutor had corrected his error after defendant's counsel had objected to the remarks and after the judge told the jury to reject unwarranted inferences. The judge noted that this single objectionable statement occurred in a 60-page closing argument and must be viewed in relationship to the entire trial.[6] He concluded as follows:

> "In reviewing the entire record, this court does not believe—based upon its twenty-five years experience as a trial judge—that this remark, modified by the judge and corrected by the prosecutor and collateral to the case was sufficiently prejudicial to sway a juror. While in every instance it is important to strive to conduct a perfect trial, this goal is rarely ever achieved and so the courts make no such demand. *United States v. Wexler*, 79 F.2d 526, 529–30 (2d Cir. 1935) (Hand, J.).

> "Had this court any serious doubt that Wigoda's rights had been prejudiced, defendant would be granted a new trial. We have no such doubt, and so defendant's motion for a new trial is denied, and judgment is entered on the verdict." [7]

 The defendant urges that the prosecutor was improperly calling upon the jury to infer from the Haskins-Gottlieb conversations, previously excluded by the trial judge, that Haskins had told Gottlieb defendant wanted money. Similarly, defendant contends that the prosecutor's argument asked the jurors to in- fer that Wigoda and Haskins discussed a payoff in the unoffered conversations between them. This was not actually what transpired. The jury was merely asked to draw upon its own experience and common sense to infer what was said in the conversations, and, as seen, the trial judge immediately cautioned the jury by stating, "It is up to the jury to judge those inferences which are not warranted and they may certainly disregard them." Thereupon the prosecutor immediately advised the jury, to the same effect that he had prefaced his remarks, that what was said in the conversations was not important anyway. The jury was later charged that it "must consider only evidence properly admitted in the case" and admonished that "statements and arguments of counsel are not evidence. They are intended only to assist the jury in understanding the evidence and the contentions of the parties."

The reasons given by the district court for finding the prosecutor's momentary error in arguing to the jury legally harmless, especially in light of his long experience as a trial judge and his superior position for judging the impact of the remark upon the jury by virtue of his presence at the trial, might alone be enough to satisfy this Court that the error was not prejudicial. Our review of the testimony and arguments in the case suggests further support for the district court's ruling. Both sides accept that Kenneth Tucker procured $50,000 from his uncle and gave it to Haskins. No one, other than Haskins, testified that the envelope containing the money was originally intended for or actually deliv-

---

5. At the post-trial hearing on the motion for a new trial the district court explained that he did not hear part of the argument of the prosecutor, resulting in his failure to note the error in the argument. The transcript contains may instances of the judge asking witnesses or counsel to speak more loudly because an infection had impaired his hearing.

6. Without considering the exhibits or the arguments to the jury, the trial transcript consumed 868 pages.

7. The remark of the prosecutor merely requested that the jury infer the contents of certain conversations, the existence of which was a part of the record. The prosecutor did not suggest that he had information inculpating the defendant which was not in evidence. Moreover, the remark was "modified by the judge and corrected by the prosecutor and collateral to the case." Therefore, *United States v. Fearns*, 501 F.2d 486 (7th Cir. 1974), *United States v. Martinez*, 514 F.2d 334 (9th Cir. 1975), and the other cases cited by the defendant are distinguishable.

ered to the defendant. Defendant took the stand and denied ever receiving the envelope with the money and further denied performing any services meriting such a payment. The crucial question decided by the jury was, therefore, which of the two men testified truthfully as to the delivery of the money. The prosecutor's request for a common sense inference as to the contents of certain conversations is not really germane to the crucial credibility question facing the jury. The jury's idea of what was said in these conversations would, it seems, depend upon which of the two crucial witnesses they believed. The jury made that credibility determination based upon its judgment as to the demeanor and possible bias of the two men and the weight which it accorded the circumstantial evidence introduced, particularly the evidence intended to show how defendant "earned" the payoff. Thus the contents of the conversations were, as the prosecutor twice noted, not important to the verdict of the jury. Therefore, we agree with the trial court that the request for an inference as to the contents of these conversations was not prejudicial error in this case.

While not amounting to prejudicial error on the facts of this case, the conduct of government counsel so closely bordered on impropriety as to deserve criticism.

In connection with the Haskins-Gottlieb conversation, government counsel asked the jury to draw inferences concerning the content of the conversation. Testimony as to such content had been excluded during trial as unduly prejudicial. See note 4, *supra*. Since the jury knew a conversation occurred, the jury might well, under the circumstances, draw inferences as to its substance, but government counsel would have shown more respect for the court's ruling that the content was prejudicial if he had not suggested to the jury that it do so, and

thus seek to focus the jury's attention on the excluded substance.

Concerning the Haskins-Wigoda conversation, the Government, after choosing not to inquire of its own witness, Haskins, as to the substance of the conversation, asked the jury, in argument, to draw inferences as to its content. Ordinarily it would be presumed that the Government did not inquire of its own witness because the answer would be unfavorable to the Government. Again it is unbecoming for the Government to omit inquiry and then to urge the jury to draw an inference favorable to the Government's case.[8]

We do not think the practice followed in these two instances affected the outcome of this trial; however, it is at least the type of close-to-the-line conduct government counsel should avoid.

Affirmed.

---

**8.** Although the record before the jury suggested no explanation for failure to ask Haskins what was said, the Government stated in oral argument in this Court that its failure was predicated upon inability, for various reasons, to predict Haskins' answer.