UNITED STATES of America,
Plaintiff-Appellee,

v.

Donald BAKKEN and Robert Balok,
Defendants-Appellants.

Nos. 83–1178, 83–1179.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 7, 1983.

Decided May 24, 1984.

---

Michael B. Brohman, Jenner & Block, Chicago, Ill., for defendants-appellants.

L. Felipe Sanchez, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUDAHY, ESCHBACH, and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

The defendants, Donald Bakken ("Bakken") and Robert Balok ("Balok"), appeal their conviction in the United States District Court for the Northern District of Illinois of knowingly transporting stolen goods valued at over $5,000 through interstate commerce in violation of 18 U.S.C. § 2314.[1] The appellants were each sentenced to five years probation and fined $2,000 apiece. We affirm.

## I. FACTS

On June 20, 1979, at approximately 11:00 a.m., the defendant Donald Bakken ("Bakken"), a truck driver for Transport Service Company, entered the property of Pet Lot Petroleum Company, a distributor of antifreeze, located in Summit, Illinois, with a tanker truck containing 4,828 gallons of Prestone II antifreeze. Bakken met with the co-defendant Robert Balok ("Balok") and Peter Lotus ("Lotus"), the owner of Pet Lot Petroleum and intended purchaser of the antifreeze. As Bakken and Balok were unloading the antifreeze from the Transport Service Company tanker, they were arrested by Chicago police officers who were investigating the case, and were subsequently indicted for transporting at least $5,000 worth of stolen antifreeze in interstate commerce.[2]

The facts preceding their arrest indicate that in May of 1979, Balok was introduced to Lotus. At the time, Lotus was purchasing approximately one million gallons of Wyandotte antifreeze per year from Lake River Terminal at $3.00 per gallon for resale to gasoline stations and warehouses. Lake River Terminal produced only Wyandotte antifreeze. Balok offered to sell Wyandotte antifreeze to Lotus at $1.82 per gallon. Lotus, Lake River Terminal's larg-

1. Section 2314 provides:
 "Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud;
 
 \* \* \* \* \* \*

 Shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

2. Bakken was to receive $300 for making the delivery and Balok was to receive $9,000 for the sale of the antifreeze.

est purchaser of Wyandotte antifreeze, called Lake River Terminal and informed them that he had a new supplier. Lake River Terminal, because the price offered to Lotus was less than the price at which it could manufacture its antifreeze, suspected that the antifreeze was stolen from its tanks. At this time, it requested and Lotus agreed to cooperate with an investigation with Lotus agreeing to purchase antifreeze from Balok for $1,000. Lotus subsequently purchased ten 55-gallon drums of antifreeze from Balok for $1,000. This antifreeze was later determined to be Lake River Terminal's product. Balok and Lotus then entered into negotiations for the delivery of 5,000 gallons of antifreeze for a $9,000 purchase price. It was at this time that Balok told Lotus the delivery would be a Prestone II shipment. The original date for the delivery to Lotus was scheduled for June 18, 1979, but at the last minute it was set back two days until June 20, 1979. Balok instructed Lotus to be at the Pet Lot Petroleum warehouse in Summit, Illinois on June 20th at approximately 11:00 a.m. and to be prepared to pay $9,000 in cash upon delivery.

The two defendants, Bakken and Balok, were well acquainted prior to June 19, 1979. The record reveals that in the months prior to the date of the alleged crime there had been numerous telephone calls between their two homes. On June 19 alone, there were four phone calls between the Bakken and Balok telephone numbers. On that date, Bakken was assigned to drive a load of Wyandotte antifreeze from the Lake River Terminal to a Chrysler Corporation plant located in Warren, Michigan. He loaded the Wyandotte antifreeze at Lake River Terminal and left for Warren, Michigan at 2:30 p.m. that afternoon. At 9:09 p.m., Bakken checked into the Sands Motel in Detroit, Michigan. He checked out a few hours later at 1:45 a.m. on June 20, 1979. At 2:18 a.m., Bakken arrived at the Chrysler plant in Warren, Michigan where he proceeded to unload the antifreeze that he had transported from Illinois. He departed from the Chrysler's Warren plant with an empty tanker at 4:02 a.m. At 5:04

a.m. that morning, Bakken entered the Chrysler Lynch Road plant in Detroit, Michigan through the main gate providing access to the tank farm. The Lynch Road facility is an automobile assembly plant with two 12,000 gallon antifreeze storage tanks on its grounds. In June of 1979, Prestone II antifreeze was being used in the new cars rolling off the assembly line at the Lynch Road plant. Neither Bakken's daily log book, the Transport Service Company's weigh bill, nor the driver control sheet indicated that Bakken was authorized to make the stop at the Lynch Road plant. Drivers entering the plant were issued a vehicle pass which required the signature of a person to authorize the entry. This pass was checked for authorization by a guard when departing from the plant. While it was a routine practice for the guards at the plant to check the pass, it was not their practice to inspect the vehicle for load capacity since it was presumed that trucks leaving the plant with passes marked "empty" were in fact empty. Gerald Fraker, a pipefitter at the Lynch Road plant, signed Bakken's vehicle pass authorizing Bakken's presence at the plant. The evidence presented at trial showed that Fraker was previously acquainted with both Bakken and Balok, as demonstrated by a phone call made from Bakken's home to Fraker's home in Michigan in May of 1979 as well as three other phone calls from Balok's home to Fraker's also in May of 1979.

On the date of the alleged theft, plant time card records indicate that Bakken spent a total of ninety-six minutes at the plant. There was conflicting evidence in the record as to the span of time required to fill a 5,000 gallon tanker. The figures ranged from approximately thirty-five minutes to sixty to seventy-five minutes.

Bakken left the Lynch Road plant at 6:50 a.m. E.D.T. and arrived in Summit, Illinois at 12:00 noon C.D.T. In route, Bakken stopped to make three telephone calls. The first two were placed to Balok's home in Illinois. The initial call was made from Marshall, Michigan at 8:43 a.m. E.D.T., ap-

proximately 200 miles from Summit, Illinois. The second call was placed from Watervliet, Michigan, at 11:00 a.m. E.D.T. approximately 107 miles from Summit, Illinois. The third call was also made at approximately 11:00 a.m. E.D.T., to William Berger, the dispatcher for Bakken's employer, Transport Service Company. During that call Bakken told Berger that he was calling from Warren, Michigan, approximately 300 miles away and would arrive in Chicago at 5:00 p.m. He further told Berger that his tanker was empty. Bakken, however, was arrested in Summit, Illinois at approximately 12:00 noon C.D.T. (1:00 p.m. E.D.T.) with a tanker full of antifreeze just two hours after his telephone call to Berger.

Meanwhile, Balok met Lotus at the Pet Lot Petroleum warehouse in Summit, Illinois, at 11:00 a.m. on June 20 as previously arranged. Lotus brought with him $9,000 in cash and displayed it to Balok. Balok advised Lotus at that time that the antifreeze he would be delivering was Prestone II. Balok then made a phone call and several minutes later Bakken appeared at the Pet Lot Petroleum warehouse. As they began to unload the Prestone II shipment, Balok and Bakken were arrested.

At the trial, the parties stipulated that Bakken's tanker contained 4,828 gallons of antifreeze when it was seized on June 20, 1979. It was also stipulated that on June 19, 1979, Bakken drove a tanker containing Wyandotte antifreeze from Illinois to Michigan and that the Wyandotte antifreeze is different from Prestone II antifreeze. In addition to the evidence discussed above, the Government presented several witnesses. However, Mr. Vern Ingram, chief of plant production for the Lynch Road facility, testified under cross-examination that he was not aware of any major shortages in June of 1979 and further stated that he had never observed a truck being loaded with antifreeze at the Lynch Road facility. Another witness, Howard Dodds, a maintenance foreman in charge of the piping system at the Lynch Road plant, testified on cross-examination that he was unaware of any major spillages of antifreeze at Lynch Road (anything over 100–150 gallons) occurring during the summer of 1979. He also testified that reports were prepared twice per day recording the inventory of antifreeze and these reports were based on readings taken by Lynch Road's pipefitters from accurate gauges attached to the antifreeze tanks.

Edwin Traister, an applications engineer employed by Union Carbide, stated that he helped set the specifications for Union Carbide's Prestone II formula. He identified a Government exhibit as a bottle containing the sample of the antifreeze taken from Bakken's tanker. He also identified Government exhibits prepared in connection with the testing of the antifreeze sample. Each report contained values given to certain ingredients which comprised the antifreeze.[3] Traister stated that the values listed were within the minimum-maximum levels which Union Carbide ascribed to Prestone II and, therefore, were consistent with the Prestone II formula. Traister also stated that he was familiar with the Wyandotte antifreeze and that Wyandotte antifreeze was vastly different from Prestone II. Finally, he testified that Prestone II was produced at four Union Carbide locations, including Alsip, Illinois.

The key Government witness, Fred Heinzmann, was the manager of special audits for Chrysler in June of 1979 and had performed audits for Chrysler since 1971. He had a general business degree, but was not certified as a public accountant. He testified that in November of 1982 he performed a number of inventory calculations of the antifreeze stored in the Lynch Road tanks in June of 1979. The first calculation showed that there were 6,322 gallons of antifreeze unaccounted for during the month of June. This figure was computed by taking the beginning antifreeze figure for the period, adding the total antifreeze purchases for the month, calculating the

---

**3.** The values contained in the report included the antifreeze's PH range, water content, boron and silicon parts and other chemical ingredients.

standard usage of antifreeze per car at the highest possible usage for all cars produced at Lynch Road during the month, and subtracting that figure to ascertain a projected inventory figure to then be compared to the June actual ending antifreeze inventory figure. Mr. Heinzmann stated that this figure was conservative because he had used a standard usage figure which represented the highest capacity of antifreeze usage for all production. The second calculation reflected that 5,107 gallons of antifreeze were unaccounted for during the given 30-day period. This figure also included the cooling system's specifications that Heinzmann claimed made this calculation more accurate. The third figure of unaccounted for antifreeze for the 30-day period was 8,196 gallons. This calculation differed from the other two figures since those figures were averaged in terms of capacity, not weighted to the highest capacity, and also those figures failed to account for temperature coolant differences. Heinzmann testified that he believed his calculations for the first two figures were more accurate, even though the 8,196 gallon figure was derived from the Lynch Road daily inventory reports. A fourth figure arrived at by Heinzmann showed 4,969 unaccounted for gallons. The procedure used to arrive at this figure was the same as the 6,322 gallon figure except that instead of using the entire month of June, the period of calculation ran from June 1 through June 25, 1979.

On cross-examination Heinzmann admitted that he neither checked the daily records of the Lynch Road plant for spillages of antifreeze in June of 1979, examined the daily meter readings on the tanks where the antifreeze was stored, nor followed any procedures to insure that the beginning and ending inventory figures upon which he relied were accurate. Heinzmann further testified that in June of 1979, the cost per gallon for Prestone II antifreeze was $1.79.

The defendants presented Melvin Oelze, an executive consultant with an accounting firm, who reviewed Heinzmann's calculations. Oelze's approach was to determine the unaccounted for number of gallons for the date of June 20, 1979. He testified that Heinzmann "made no arithmetic errors" in his calculations and that his methodology for all four calculations was consistent in computing the four different inventory figures. He then computed what he believed to be the unaccounted for gallons of antifreeze for June 20, 1979, by taking the standard antifreeze usage for that day and subtracting it from the actual usage. Oelze determined that Lynch Road was short 2,026 gallons of antifreeze on June 20. After reviewing the daily inventory figures for antifreeze during June of 1979, Oelze concluded that Lynch Road experienced an average daily antifreeze variance of 409 gallons. He concluded that the variance of roughly 2,000 gallons on June 20 was neither unique nor unusual. Oelze concurred in Heinzmann's conclusion that Prestone II antifreeze cost $1.79 per gallon in June, 1979. The defendants also offered the testimony of Steve Willis, a partner in an accounting firm, who testified that Heinzmann's working papers did not follow generally accepted auditing principles.

In finding the defendants guilty of violating 18 U.S.C. § 2314, the district court judge stated that while he had some reservations as to the accounting methods employed by the Chrysler employee, he was satisfied that at least for purposes of this trial and the evidence presented the audit was sufficient to establish that the Government had proven the defendants guilty beyond a reasonable doubt.

The issue on appeal is whether the Government proved beyond a reasonable doubt that the defendants transported stolen goods or merchandise with a value of $5,000 or more in interstate commerce in violation of 18 U.S.C. § 2314.

## II. DISCUSSION

In determining whether sufficient evidence was presented to prove the $5,000 jurisdictional amount beyond a reasonable doubt, two factors must be considered. First, the appropriate market value to be

attached to the goods in question must be determined and second, the quantity of stolen goods shipped through interstate commerce must be established. Both factors are in dispute in this case.[4] We will first address the question regarding the proper market value to be applied.

## A. MARKET VALUE

 Section 2314 provides that whoever knowingly transports in interstate commerce any stolen goods with a value of $5,000 or more commits a federal offense. 18 U.S.C. § 2314 (1982). Section 2311 defines value:

> " 'Value' means the face, par, or market value, whichever is the greatest, and the aggregate value of all goods, wares, and merchandise, securities, and money referred to in a single indictment shall constitute the value thereof."

18 U.S.C. § 2311. The test employed in determining market value under § 2311 is the price a willing buyer will pay a willing seller either at the time and the place the property was stolen or at any time during the receipt or concealment of the property. *United States v. Berkwitt*, 619 F.2d 649, 657 (7th Cir.1980); *United States v. Riso*, 405 F.2d 134, 137 (7th Cir.1968), *cert. denied*, 394 U.S. 959, 89 S.Ct. 1306, 22 L.Ed.2d 560 (1969). The Government contends that the $3.00 per gallon Wyandotte price and not the $1.79 per gallon Prestone II price is the appropriate market value in this case. In support of this assertion it cites the language of § 2311 which provides that market value "means the face, par, or market value, *whichever is the greatest....*" (emphasis added). The Government apparently contends that the $3.00 per gallon price is the figure which

should be applied since it is the greatest of the market values presented in this case. In the alternative, the Government, citing *Cave v. United States*, 390 F.2d 58, 67 (8th Cir.1968), *cert. denied*, 392 U.S. 906, 88 S.Ct. 2059, 20 L.Ed.2d 1365, next contends that under the willing buyer-willing seller valuation method, the $3.00 per gallon price that Lotus was ready and willing to pay Lake River Terminal for its antifreeze constitutes the legitimate market price of the antifreeze.

We are not persuaded by these arguments since the Government's first position ignores the willing buyer-willing seller test and its second position attempts to apply the market price of one product to establish the market value of the different stolen product.

In its reading of § 2311 the Government interprets the language "market value, whichever is the greatest" to mean the greatest of all the possible market values, in other words, the greatest retail, wholesale or manufacturer's price.[5] However, this interpretation of § 2311 disregards the willing buyer-willing seller test since it advocates imposing the highest price on an item without regard to the product involved or the price at which the buyer would be willing to purchase the goods. In *United States v. Berkwitt*, 619 F.2d 649 (7th Cir. 1980), this court implicitly rejected the Government's approach. In *Berkwitt*, the defendants were convicted of pirating 8-track tapes lacking the proper copyright notices. The court noted that a jury could have reasonably applied the retail market price to the tapes, however, it rejected this approach by stating:

> "we think this evaluation system could lead to misleading results in the present

---

**4.** Since the defendants did not request any special findings and the district court entered a general finding of guilty, we must review the applicable law and the facts in this case in some detail in order to establish the proper market price and quantity of goods stolen.

**5.** In its brief, the Government cites the case of *United States v. Watkins*, 709 F.2d 475 (7th Cir. 1983) in which this Court affirmed a jury instruction stating that value means "face, par or

market value or cost price, either wholesale or retail, whichever is greater." *Id.* at 480. In that case the defendant was convicted under 18 U.S.C. § 641 of selling United States Post Office property with a market value in excess of $100.00 without proper authorization. The *Watkins* case, however, is not applicable to the instant action since the jury instruction quoted the exact language provided within 18 U.S.C. § 641.

case for it would include a profit margin appellants reasonably could never have obtained in the illegitimate market."

*Id.* at 657 (footnote omitted).[6] In *Berkwitt,* the court also rejected the wholesale value of the stolen property. Noting that the stolen items in that case were unique because the pirated sound waves were intangible goods that were transferred to legitimately purchased blank tapes, the court stated that "the evaluation methods used in the more traditional 'garden variety' § 2314 prosecutions are not necessarily applicable here...." *Id.* The court then applied the "thieves market" price because it believed that it incorporated only a profit margin that the defendants could have obtained.[7]

From our examination of the cases dealing with the issue of § 2314 market value, the courts have closely examined and ruled on the particular facts in the specific case in order to determine the price that the seller *could* obtain for the stolen goods. *See, e.g., United States v. Perry,* 638 F.2d 862, 866 (5th Cir.1981); *United States v. Berkwitt,* 619 F.2d 649, 657–58 (7th Cir. 1980); *United States v. Riso,* 405 F.2d 134, 137 (7th Cir.1968), *cert. denied,* 394 U.S. 959, 89 S.Ct. 1306, 22 L.Ed.2d 560 (1969); *United States v. Tippett,* 353 F.2d 335, 338 (1965).[8] Unfortunately, the record below only discloses three prices: the $3.00 per gallon price that Lotus was paying for the Wyandotte antifreeze, the $1.79 per gallon price that Chrysler paid for the Prestone II antifreeze and the $1.80 per gallon price Lotus was willing to pay to the defendants for the stolen Prestone II antifreeze.[9] The record does not disclose what the defend-

ants could have obtained in the market for the Prestone II antifreeze, nor does it disclose the price that a wholesaler, like Lotus, the owner of Pet Lot Petroleum Company, would have paid in Illinois for Prestone II during the period in question. Thus, the evidence presents us with two choices: the $3.00 per gallon or $1.79 per gallon as the price that the defendants could have obtained for the antifreeze. Both prices represent a wholesale price for the product. The $1.79 figure is the wholesale price paid by Chrysler for the Prestone II antifreeze and the approximate price Lotus was willing to pay Balok, and the $3.00 figure is the wholesale price for the Wyandotte antifreeze.

The Government, however, next argues that because Lotus was willing to pay Lake River Terminal $3.00 per gallon for Wyandotte antifreeze, the $3.00 price represents the proper market value for the stolen Prestone II antifreeze. However, Edwin Traister, an applications engineer employed by Union Carbide, testified at trial that Prestone II is vastly different from Wyandotte antifreeze. The parties themselves stipulated to this fact at trial. Although the record does not disclose the normal selling price for Prestone II in Illinois, it is possible to have different degrees of quality between similar products that compete against each other in the same market. These differences will be reflected in the price of the product in the relevant market. The defendant should only be found guilty based upon the market value of the stolen product. No case has been cited to us, nor have we been able to discover any case in

---

**6.** In the present case it is unlikely that the defendants could have negotiated a price of $3.00 per gallon for the antifreeze since Lotus would not have had any incentive to change suppliers where his new supplier was charging the same price as his old supplier.

**7.** The thieves market retail price was the price at which the defendant's purchaser or middleman sold the tape to the public.

**8.** A line of earlier cases apparently applied the greatest of either the wholesale or retail price to the stolen product. *See Gordon v. United States,*

164 F.2d 855, 858–59 (6th Cir.1947), *cert. denied,* 333 U.S. 862, 68 S.Ct. 741, 92 L.Ed. 1141 (1948); *Husten v. United States,* 95 F.2d 168, 171 (8th Cir.1938). Although this view has not been accepted by recent decisions on the topic, the *Gordon* and *Husten* decisions are not on point since here we are dealing not with the greatest of retail or wholesale prices of the stolen product but the greatest of different wholesale prices to be applied to the stolen product.

**9.** This price was obtained by dividing the $9,000 purchase price by the agreed upon 5,000 gallons to be delivered.

support of the Government's position that the market value of one product may be used to establish the market value of another. *See, e.g., United States v. Perry,* 638 F.2d 862 (5th Cir.1981); *United States v. Berkwitt,* 619 F.2d 649 (7th Cir.1980); *United States v. Riso,* 405 F.2d 134 (7th Cir.1968), *cert. denied,* 394 U.S. 959, 89 S.Ct. 1306, 22 L.Ed.2d 560 (1969); *Cave v. United States,* 390 F.2d 58 (8th Cir.), *cert. denied,* 392 U.S. 906, 88 S.Ct. 2059, 20 L.Ed.2d 1365 (1968). In all these cases, the courts concentrated on the price the defendants could have received for the stolen goods. However, our holding today does not preclude the use, in certain situations, of a price of similar product to establish the market value of the stolen product.

The record establishes that Prestone II was the antifreeze in Bakken's tanker at the time it was seized. This product was sold to the Lynch Road plant in Michigan at $1.79 per gallon. Balok was willing to sell the Prestone II to Lotus in Illinois for approximately $1.79 ($9,000 purchase price divided by the approximately 5,000 gallons sold). Applying the willing buyer-willing seller test to the facts of this case, we hold that the market price for the stolen product is $1.79 per gallon.[10]

## B. QUANTITY

We now turn to the issue of whether a sufficient quantity of goods passed through interstate commerce to establish the requisite jurisdictional amount under 18 U.S.C. § 2314.

■ Under 23(c) of the Federal Rules of Criminal Procedure when a case is tried without a jury, the court is required to make a general finding in the absence of a request for a special finding. Since the defendants failed to request a special finding and the trial court entered a general verdict of guilty, we can assume that the trial court found in the Government's favor with respect to whether all 4,828 gallons of antifreeze seized from the defendant's tanker was stolen and transported through interstate commerce. *United States v. Zweig,* 562 F.2d 962, 963 (5th Cir.1977); *Lustiger v. United States,* 386 F.2d 132, 135 (9th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1042, 19 L.Ed.2d 1142 (1968). This position is bolstered by the fact that the trial judge found the audit figures presented by the government witness sufficient for purposes of this trial and that there was an absence of testimony, much less any cross-examination, from the government witnesses to the contrary. Viewing the evidence in the light most favorable to the Government, this court must affirm if we determine that any rational trier of fact could find beyond a reasonable doubt that the defendants committed the crime charged. *United States v. Moya,* 721 F.2d 606, 610 (7th Cir.1983); *United States v. Fleming,* 677 F.2d 602, 609 (7th Cir.1982) (citing *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)); *United States v. Wigoda,* 521 F.2d 1221, 1225 (7th Cir.1975), *cert. denied,* 424 U.S. 949, 96 S.Ct. 1421, 47 L.Ed.2d 355 (1976).

■ The defendants have referred this court to two cases where the convictions under § 2314 were reversed because the courts determined that the Government's proof was, at best, speculative. *See United States v. Perry,* 638 F.2d 862 (5th Cir. 1981); *United States v. Chandler,* 586 F.2d 593 (5th Cir.1978), *cert. denied sub*

---

**10.** The Government cites *Cave v. United States,* 390 F.2d 58 (8th Cir.), *cert. denied,* 392 U.S. 906, 88 S.Ct. 2059, 20 L.Ed.2d 1365 (1968) as an example of a case which applied the retail price (i.e. the greatest price) to the stolen product. For the reasons mentioned above in the text of this opinion, we do not find this case to be persuasive. Upon close examination of the *Cave* decision the goods were valued at retail because they were stolen from retailers. We do not believe that this case meant to imply that

the retail price should be applied to stolen goods in all cases. As stated earlier, this approach was rejected by this circuit in *United States v. Berkwitt.* As an example of when the wholesale price should be used, *see United States v. Perry,* 638 F.2d 862, 866 (5th Cir.1981), where the court found that the best price the defendant would be able to obtain for the stolen goods, stolen in wholesale lots, was the wholesale price.

*nom., Morrow v. United States*, 440 U.S. 927, 99 S.Ct. 1262, 59 L.Ed.2d 483 (1979). In *Perry,* the defendant was charged with stealing cases of cashews and pistachio nuts. During the time specified in the indictment, it was uncertain as to how many cases of nuts had been delivered to the warehouse where the stolen nuts were being stored. Viewing the evidence in the light most favorable to the government, the court found the most that could have been transported during the time alleged in the indictment was insufficient to establish the requisite jurisdictional amount. In *Chandler,* the defendant was accused of stealing and transporting gasoline in interstate commerce. Trucks were observed carrying and unloading the gasoline, but proof as to the quantity of fuel carried by the trucks was insufficient to establish the jurisdictional amount. The Government's case was based on the assumption that each truck was filled to capacity on every interstate trip. This assumption was based upon FBI surveillance that the trucks appeared to be straining under a heavy load as they crossed the state line. The court found that this evidence was simply not enough to support the inference that the trucks were filled to capacity in order to establish the jurisdictional amount. *Chandler,* 586 F.2d at 602. Weighing the facts presented to us in the instant case against the holdings in *Chandler* and *Perry,* we find neither case to be persuasive. At the time of Bakken's and Balok's arrest it was established that the defendants were carrying 4,828 gallons of antifreeze. Unlike *Chandler* and *Perry* where the evidence was at best speculative as to the quantity of stolen goods transported, there was more than enough evidence in the record in this case to support the conclusion that the 4,828 gallons of antifreeze were stolen and transported through interstate commerce to Illinois.

Beside taking issue with the calculation establishing the amounts of antifreeze missing from the Lynch Road plant, the defendants assert that no witnesses testified that they had observed Bakken load any antifreeze into his tanker at Lynch Road. The defendants further assert that Bakken's gate pass indicated his tanker was empty when he left Lynch Road and that no one saw where Bakken went when he arrived back in Illinois. Finally, they contend that Prestone II antifreeze is produced in Illinois and that the Government did not exclude the possibility that the antifreeze found in Bakken's tanker came from Illinois. Therefore, the defendants conclude that the evidence fails to demonstrate that the defendants were guilty beyond a reasonable doubt. We cannot agree with this interpretation of the evidence since the evidence produced at trial when read in its entirety proves much more than the defendants' interpretation.

The record discloses the following uncontradicted evidence. Both defendants were to be compensated for the delivery and sale of the antifreeze. Bakken made an unauthorized and unexplained stop at the Lynch Road facility which has several antifreeze storage tanks, after making his assigned delivery of the Wyandotte antifreeze to a plant in Warren, Michigan. He entered the Lynch Road plant at 5:04 a.m. and left ninety-six minutes later at 6:50 a.m. There was evidence in the record to establish that it took anywhere from thirty-five minutes to sixty to seventy-five minutes to fill a tanker. Therefore, Bakken had sufficient time to fill his tanker with a full load of antifreeze. Bakken's gate pass was signed by an employee of the Lynch Road facility who was acquainted with both the defendants as evidenced by the exchange of telephone calls between their residences one month prior to the theft. The signed gate pass gave Bakken the needed permission to be within the confines of the plant. He left the Lynch Road plant at 6:50 a.m. E.D.T. and arrived in Summit, Illinois before 12:00 p.m. (noon) C.D.T. During this time Bakken made three telephone calls. Two of the calls were placed to the residence of his co-defendant in Illinois. The other call was placed at 10:00 a.m. C.D.T. (11:00 a.m. E.D.T.) to William Berger, the dispatcher for Bakken's employer, Transport Service Company. Bakk-

en told Berger that he was calling from Warren, Michigan, approximately 300 miles east of Chicago, when in fact he was in Watervliet, Michigan some 107 miles from Chicago. He told Berger that he would arrive in Chicago at approximately 5:00 p.m. that afternoon and that his tank was empty. However, Bakken arrived in Summit, Illinois, a suburb of Chicago, before 12:00 noon C.D.T. with 4,828 gallons of Prestone II antifreeze, the only type of antifreeze used at the Lynch Road facility.

A Government witness presented three different figures for missing antifreeze from the Lynch Road facility for the month of June and based upon various standard usages, the amount of missing antifreeze ranged from 5,107 to 8,196 gallons. A 4,969 gallon figure was also computed for a 25-day period in June. The defendant attacked these figures by first noting that Heinzmann, the Government witness who calculated these figures, did not insure that the beginning and ending inventory amounts were accurate and that he failed to check for any major spillages during the month.[11] The maintenance foreman in charge of the piping system, Mr. Dodds, testified that inventory readings were prepared twice per day and that the gauges measuring the inventory of antifreeze in the tanks were accurate. The defendants presented their own witnesses, one who testified that according to his calculations, on June 20, 1979, the day of the alleged theft, only 2,026 gallons were missing, and another who testified that Heinzmann did not follow generally accepted auditing principles.

The district court recognized the deficiencies in the controls over the computations, but apparently determined that in light of all the evidence presented regarding the defendants' conduct the requisite jurisdictional amount was established.

The defendants' own figures alone indicate that a substantial amount of antifreeze was missing. On the way back to Summit, Illinois, given Bakken's tight time schedule and the fact that his route was traced by his phone calls, it is apparent that he did not have an opportunity to pick up an additional 3,000 gallons. When considering the totality of the evidence presented at trial concerning Bakken's extremely suspicious conduct on his trip back to Illinois from Michigan, and the fact that at the time of their arrest in Illinois the tanker contained 4,828 gallons of Prestone II antifreeze, the value of which is over $5,000, we hold that a rational trier of fact could have found that the defendants were guilty beyond a reasonable doubt.

As an alternative theory, the defendant raises the possibility that the antifreeze was taken from a Prestone II manufacturing plant in Alsip, Illinois, a suburb on the southwest side of Chicago. We find that the defendants' unsubstantiated suggestion that Bakken may have in fact taken the antifreeze from the Illinois facility is at best speculative in nature when balanced against the Government's evidence presented at trial. As we stated in *United States v. Wigoda*, 521 F.2d 1221 (7th Cir.1975):

> "Where the evidence is circumstantial it is not necessary that it be such as to exclude every reasonable hypothesis other than that of guilt. As with the direct evidence, it is only necessary that the jury be convinced of guilt beyond a reasonable doubt."

*Id.* at 1225 (quoting *United States v. Ernest, Inc.*, 509 F.2d 1256, 1261 (7th Cir. 1975)). Using the defendants' figures of 107 miles, the alleged distance between Watervliet, Michigan where Bakken made a telephone call at 11:00 a.m. E.D.T. (10:00 a.m. C.D.T.) two hours prior to his arrest, and the thirty-five minute figure, the most conservative figure in the record as to how long it would take to load a tanker, the defendant would have us believe that it was possible that in the remaining eighty to eighty-five minutes he traveled 107 miles, detoured off his route to Summit,

---

**11.** However, two plant employees, a Mr. Ingram in charge of plant security and a Mr. Dodds in charge of the piping systems, testified that they were not aware of any major spillages or shortages during the month of June.

Illinois in order to stop at the Prestone II manufacturing facility in Alsip, Illinois, and in broad daylight stole a tanker full of antifreeze. While this theory is novel, it is not convincing given the facts of this case.

Therefore, applying the $1.79 per gallon Prestone II antifreeze price to the 4,828 gallons of antifreeze found in the defendants' tanker, we hold that a rational trier of fact could find that the 18 U.S.C. § 2314 $5,000 jurisdictional amount was established beyond a reasonable doubt. The decision of the district court is affirmed.